## W. B. JONES *v.* MADISON COUNTY.

| 72 | 777 |
| 75 | 832 |
| 72 | 777 |
| 86 | 385 |
| 86 | 386 |
| 72 | 777 |
| f93 | 164 |
| 93 | 166 |

1. AGREEMENT BY PARTIES.  *Matter of law.   Validity of statute.*

   While the facts of a case may be settled by agreement of the parties, this court cannot, upon a mere concession or admission of counsel, declare a statute valid or invalid.

2. SIXTEENTH SECTION SCHOOL LANDS.  *Origin and title.   Cession by Georgia.   Act of congress of March 3, 1803.*

   By the fifth clause of the articles of agreement and cession between the United States and Georgia in 1802, the lands ceded by that state to the United States were to form states and be admitted to the union on the same conditions and restrictions, with the same privileges and in the same manner, as provided by the ordinance of July 13, 1787, for the government of the Northwestern Territory. Under said ordinance and pursuant to uniform public policy, the sixteenth section in every township in all new states admitted to the union have been appropriated for school purposes. By the twelfth section of the act of congress of March 3, 1803, providing for a survey and sale of the public lands in the Mississippi territory, all sixteenth sections were "reserved in each township for the support of schools within the same." *Held,* that the state of Georgia, not the United States, is the donor of these school lands; that the United States took no title, except in trust for the states to be created, and that, after a survey of the sections and on the admission of Mississippi as a state, the title and control of these sections vested in the state, in trust for the inhabitants of the several townships. *Hester* v. *Crisler,* 36 Miss., 681, and cases following it, overruled.

3. SAME.  *Lease of school lands.   Governed by state laws.*

   Accordingly, for the purpose of administering the trust, the state, not the United States, has control of sixteenth section school lands, and the act of congress of 1852 (Code 1857, p. 696) making the assent of the inhabitants of the townships a prerequisite to the validity of leases and sales, was beyond the power of congress, and

is of no force, and a lease made in conformity to the statutes of this state is valid without the previous assent of the inhabitants of a township, where the statute does not require this.

4. STARE DECISIS.    *When rule not applicable.    Tenure of school lands.*

A decision of this state erroneously holding that the title to sixteenth section school lands is in the United States instead of the state, does not establish a rule of property, and, though followed for many years, the doctrine of *stare decisis* will not be applied.

5. LEASE OF SCHOOL LANDS.    *Reconveyance.    Outstanding term.    Title.*

Where the lessee of sixteenth section school lands, after receiving an absolute conveyance, but before payment therefor, conveys the term to another on credit, and obtains a decree against his vendee enforcing his vendor's lien, and, subsequently, without enforcing his decree or obtaining a reconveyance from his vendee, conveys the term to the county in payment of the balance due by himself, the county acquires no title, legal or equitable, to the term by such reconveyance.

6. LANDLORD AND TENANT.    *Estoppel to dispute landlord's title.    Defense.    Term.    Adverse possession.*

While a tenant may not plead an adverse title as against the landlord's title to the reversion, where a lessee of sixteenth section school lands received from the county an absolute conveyance of the term and enters thereunder, and the county, denying the validity of the lease, seeks to oust him, he may, in defense of his term and as against the county's claim to immediate possession, make any defense which would be available against a stranger. He may show that the county had no title to convey him, having previously conveyed the term to another, and may, as against such demand by the county, set up the outstanding term of such other, which, by reason of his adverse possession for ten years, he has acquired.    *Brown* v. *Supervisors*, 54 Miss., 230.

FROM the chancery court of Madison county.

HON. H. C. CONN, Chancellor.

The facts are stated in the opinion.

The case was first argued and submitted at the October term, 1894 (*Nugent & McWillie* and *W. H. Powell*, for appellant; *H. B. Greaves* and *F. B. Pruttt*, for appellee).    On this submission, as the opinion states, counsel, in their briefs and arguments, and the court in its opinion, dealt with the cause upon

the idea and theory that the validity of the lease in question was determinable under the act of February 24, 1842 (Hutch. Code, p. 222), and the court, acting on the concession of counsel as to this, delivered an opinion holding that the lease of 1851 to Shackleford was void, because, by the terms of that statute, title could not vest in the purchaser or lessee until the whole of the purchase money was paid, and it was admitted that the purchase money for his lease had not all been paid by Shackleford.    The court, therefore, affirmed the decree of the lower court holding the lease void.

*Nugent & Mc Willie,* for appellant, filed the following suggestion of error to the opinion first rendered:

The agreed statement of facts recites that the lease was made in the manner and form required by law, and that the board of school trustees were properly constituted and authorized to lease said lands.    Because of this stipulation, we took no note of the argument of appellee's counsel based upon the provisions of the act of 1842.    In view of the agreement, we do not suppose the court will go into consideration of the feigned issue as to the validity of the lease.    The lease to Shackleford was not made under Hutchinson's code, but under § 7 of "An act to reduce into one the several acts heretofore passed in relation to the sixteenth sections and common schools, so far as relates to Hinds county."    Laws 1850, p. 133.    This act, by § 28, was applied to Madison and Claiborne counties.    As to these counties, all laws in relation to schools and school lands prior to 1848 were repealed.    This act did not contain the provision of the act of 1842, that the title was not to pass to a lessee until complete payment, but, under § 8, notes given for the purchase money were to be a lien upon the land no matter how often they might be renewed.    The seventh section of the act of 1850, which provides for renewing the purchase money notes, necessarily excludes the idea that the ordinary statute of limitations did not apply to them as to all other notes.    See,

also, *Madison Co.* v. *Powell*, 71 Miss., 618.   It matters not if the lease to Jones be void, since the county cannot go back on the lease made in 1851 to Shackleford.

The act of 1850 is not inoperative because of not providing for the consent of the inhabitants of the township.   The act of congress of May 19, 1852, authorized the sales of sixteenth sections, but contained the proviso that in no case should the lands be sold or leased, except by the consent of the inhabitants of the township, in such manner as the legislature might direct. The last section of the act provided that previous sales are ratified and approved in the same manner and to the same extent as if the act had been in force at the time of the sales. It appears on the surface of this act that the consent of the inhabitants as to future sales was indispensable, but it is clearly apparent that this consent was to be obtained in such manner as the legislature might direct.   It did not make, or intend to make, a condition precedent to the declaration by the legislature of such validity.   Congress was dealing with a subject upon which the state had taken action, and with titles that had accrued under state laws that had been fairly and properly followed.   It was the manifest purpose to concede the validity of the laws and sales under them as to past transactions, and provides for new sales or leases with the consent of the inhabitants.   Otherwise, we would be met with a serious complication.   To make every sale or lease dependent upon a previous consent, probably given, but of which no memorial had been preserved, would be to give a " serpent for a fish."   Congress did not surely so intend.   It was declared that sales previously made should be ratified and approved, not provided that they had been made with the consent of the inhabitants, but to the same extent and in the same manner as if the act of 1852 had been in force, and, necessarily, had been fully complied with.   When the act of congress of 1852 was passed, our senators and representatives in congress must have been aware of the existence of the act of 1850 and of the doubt as to the state's right to

dispose of the sixteenth section reservation, and, no doubt, procured the passage of the act to meet the exigency. It was undoubtedly the purpose to ratify and not invalidate past laws.

We again invoke the benefit of the stipulation of counsel that the lease was made in the manner and form required by law. The lease itself recites that the heads of families in said township instructed the board of trustees to lease the sixteenth section for ninety-nine years, and that, in obedience to such request, with the consent of the majority of two-thirds of the heads of families, the board leased the same. We take it that appellee, the county, is bound by its pleading quite as much as any other litigant. The cross bill charges the validity of the lease to Shackleford, and the answer fully admits it.

*Brame & Alexander*, for parties in interest, by leave of court, filed the following suggestion of error:

We are so thoroughly convinced that the decree of the lower court should be reversed that we avail of the courtesy extended to us by this court to present our views. As one result of our investigation, we find that our high court of errors and appeals does not seem to have given to the question of school lands and their tenure the thorough and exhaustive consideration they have received by other tribunals. The utterance of our court in *Hester* v. *Crisler*, 36 Miss., 681, to the effect that, prior to the act of congress of 1852, Mississippi had no legal or equitable title to these school lands, is not in accord with the views entertained by other courts, and we submit that it is not true, as therein held, that the right of the state, or of the inhabitants of the township, rests solely, or even mainly, on national grant.

Let us examine briefly the history of the legislation, national and state, relative to school lands. After the cession of the Northwestern Territory by the state of Virginia, pursuant to a resolution of congress to provide for the temporary organization thereof (Land Laws, 339), the ordinance for ascertaining the mode for the disposition of land in the Western Territory

was passed May 20, 1785 (Land Laws, 349). In this ordinance we find the first evidence of a governmental policy to devote the sixteenth section in every new state to the maintenance of public schools. The ordinance for the government of the Northwestern Territory, passed July 13, 1787, made no specific reference to school lands, but by section 3 provided that "religion, morality, and knowledge being necessary to a good government and the happiness of mankind, schools and the means of education should be forever encouraged." At the same time, congress, in directing the treasury department to sell lands in said territory, provided for "lot No. 16 in each township, or fractional part of a township, to be given perpetually for the purposes contained in said ordinance," meaning the ordinance of 1785 (Land Laws, p. 362).

It is well known that the lands formed into Mississippi territory, and afterwards Mississippi state, belonged, originally, to Georgia. By the act of congress of April 7, 1798, "settling the limits of the state of Georgia, and establishing a government for the Mississippi territory," said territory was given all the rights and privileges which had been granted to the Northwestern Territory. The president was given the right to establish a government for the Mississippi territory "similar in all respects to that now exercised in the territory northwest of the Ohio" (Land Laws, p. 115). By an act supplemental to the foregoing, the right of Georgia to her reserved lands in the Mississippi territory was recognized and confirmed. By the very act of cession, it was distinctly provided that the lands should be formed into states, which should have and exercise the rights granted to the Northwest Territory. As we have seen, it was part of the law of that territory that the sixteenth sections should be devoted to school purposes. It is, therefore, not through any act of grace on the part of the United States that Mississippi now has her sixteenth sections. It was part of the compact between Georgia and the United States. The lands were not owned by the United States unconditionally, and re-

served, or even granted, with a new trust to the state. The trust already existed, and all subsequent acts of the United States in reference to sixteenth sections are but a recognition of the trust created by that compact. The status of our school lands was fixed by the act of cession, and neither congress nor the state legislature can change it.

By the act of congress of 1815, the leases by the agents of territory were to cease when the territory should be admitted as a state. This seems to have been in recognition of the fact that, the state, when formed, should succeed to the title and control of the lands. The act of 1817 admitting Mississippi into the union, provided that all waste or unappropriated lands should be given to the United States (Land Laws, p. 705). We have seen that the sixteenth sections had already been appropriated by the act of cession, and did not come within the terms of this grant to the general government. We find no act of congress subsequent to this until 1852, but during all this time the state legislature and our courts acted on the idea that the power inhered in the state as trustee. This power was never questioned by congress, and innumerable property rights accrued under our state legislation and decisions. In *Connell* v. *Woodard*, 5 How. (Miss.), 665, it is said that the right of the state to lease these lands had been recognized and acted upon too long to be an open question.

While our court continued to affirm this right as one not questioned, the subject was more thoroughly considered in other states. See *Long* v. *Brown*, 4 Ala., 622, which holds that the right of Alabama to the school lands rests on the terms of the cession by the state of Georgia, instead of on congressional grant. See, also, *State* v. *Springfield*, 6 Ind., 83; *State* v. *Sickler*, 9 *Ib.*, 67; *Payne* v. *St. Louis County*, 8 Mo., 473; *Greenleaf* v. *Trustees*, 22 Ill., 236. This view is sustained also by the decisions of the supreme court of the United States. In *Gaines* v. *Nicholson*, 9 How. (U. S.), 356, it is said: "The state of Mississippi acquired a title to every sixteenth section

by virtue of these acts, on the extinguishment of the Indian right of occupancy." Later, in *Cooper* v. *Roberts*, 18 How. (U. S.), 173, the title and exclusive control of the state is distinctly recognized. The court, speaking of the acts of cession by Virginia and Georgia, says: "The trusts created by these compacts relate to a subject certainly of universal interest, but of municipal concern, over which the power of the state is plenary but exclusive." This decision cites with approval *Long* v. *Brown*, *supra*. See, also, *Roberts* v. *Cooper*, 20 How., 467; *Minnesota Co.* v. *National Co.*, 3 Wall., 332.

The relative rights of the state of Georgia and the United States in respect to the territory of the former are fully discussed in the celebrated case of *Fletcher* v. *Peck*, 6 Cranch, 87. See, also, *Robinson* v. *Minor*, 10 How., 627, and *Pollard* v. *Hagan*, 3 *Ib.*, 212. These cases settle that on the formation of new states nothing whatever remains in the United States except the public lands, and, furthermore, that sixteenth sections are not public lands within the meaning of federal legislation and decisions. See, also, *Newhall* v. *Sanger*, 92 U. S., 761.

The language used in appropriating, granting or reserving school lands throughout the union in the new states is very diverse. Laying aside all idea of compact arising out of the cession, and treating the United States as the charitable donor, it is not possible to conceive that it was intended that the rights of the general government of the states and of the townships, should vary in the different states according to the language employed in each case. It is more consonant with reason to hold that, under a settled, uniform policy, the general government held the title and control of these lands only during the territorial period, and that, on the formation of new states, the trusts devolved on the states. See dissenting opinion in *Vincennes* v. *Indiana*, 14 How., 268.

Much of the northern part of Mississippi, all of which was acquired from Georgia, was held by the Chickasaw Indians.

By the treaty with them at Pontotoc Creek, they ceded their territory to the United States. There was at that time much controversy in respect to the title of these territorial lands, but it was finally settled that the United States derived title from Georgia, and that the Indian tribes had only the right of occupancy. To settle all controversy as to the title, congress passed the act of July 4, 1836 (Code 1857, p. 682), entitled "An act to carry into effect the existing compacts with the states of Alabama and Mississippi as to . . school reservations." This act appropriated one thirty-sixth part of the land for school purposes, and uses the following language: "Which lands shall vest in the state of Mississippi." This act is a distinct recognition of the tenure by which the state holds its school lands.

We have thus shown that *Hester* v. *Crisler* is an erroneous decision. It established no rule of property, since a state cannot invoke in its own favor, against a citizen, an erroneous decision of its own court. The whole doctrine of *stare decisis* is for the protection of persons who act on the faith of what the state, through its courts, declares. It has no application in favor of the lawmaking power. It follows, from what we have said, that the act of congress of 1852 is without any force, and, as the lease was in conformity to the laws of this state, it should be upheld.

On the foregoing suggestions of error a reargument was granted.

*Nugent & Mc Willie,* for appellant, on the reargument.

1. In the articles of cession and agreement between the state of Georgia and the United States, entered into in 1802, it is stipulated as one of the fundamental conditions that the territory ceded shall form a state " on the same conditions and restrictions, with the same privileges and in the same manner as provided in the ordinance of congress of 1787 for the government of the western territory of the United States, which or-

dinance shall, in all its parts, extend to the territory contained in the present act of cession, that article only excepted which forbids slavery." In *Cooper* v. *Roberts*, 18 How., 173, the court discusses the nature of the compact between Georgia and the general government, and recognizes the fact that the right of the states to the sixteenth section school lands rests on this compact and the purpose of congress to consecrate the same central section of every township in every state to the promotion of "good government and the happiness of mankind by spread of religion, morality and knowledge." The court further, in treating of the consent of congress to the sale of these lands by the state, says: "But this consent was not, perhaps, necessary, and the application for it is but evidence of the strong desire of the state authorities to act in good faith and keep within the pale of the law," and cites 4 Ala., 622. *Minnesota* v. *Bachelder*, 1 Wall., 109, distinctly recognized the right of the state of Minnesota to the school sections within it. And see *Ham* v. *Missouri*, 18 How., 126, as to the title of that state to sixteenth sections. In that case the words of reservation construed are identical with those employed in the act of March 3, 1803. We find that the supreme court of the United States has been consistent in all its utterances, and has declared (1) that the words used in the act of 1803 confer a clear, positive and unconditional donation of the sixteenth section in every township; (2) that a title derived under the state will prevail over a patent afterwards obtained from the United States; (3) that as soon as the lands in this state were surveyed and the sixteenth sections identified, the title vested in the state without patent; (4) that previous authority by congress for the sale of the school sections was not necessary; (5) that the application therefor was simply evidence of the strong desire of the state authorities to act in good faith; (6) that the whole matter of dealing with these sections was relegated, by virtue of the reservation contained in the act of congress, to the good faith of the states. Thus considered, it

is not important to inquire into the intent and meaning of the Georgia cession, or whether title to the sixteenth sections is derived under it, as title under the act of 1803 is clearly potent. The decisions of our state are conflicting, and do not conform to the just conclusion above stated.     *Hester* v. *Crisler*, 36 Miss., 681, is in conflict with the doctrine settled by the supreme court of the United States.

2. Appellant was not estopped to acquire the outstanding term from Hill asserted against the county.     In doing so, he was not denying the reversionary interest of the state or county arising from the conveyance to Shackleford or himself.     If any further answer be necessary, it is found in the fact that the case here presented is an exception to the rule invoked.     *Blight's Lessee* v. *Rochester*, 7 Wheat., 535.     The county could not, in the very act of disregarding the contract itself, insist that the defendant was bound, in good faith, to acknowledge a title which had no real existence.     3 Pet., 43; 4 *Ib.*, 506; 5 *Ib.*, 402; 2 Metc., 32.

*H. B. Greaves*, for appellee.

Counsel for appellant base their argument entirely upon a misconception of appellee's contention, and of the former opinion of the court in this case.     There is nothing in the case of *Hester* v. *Crisler*, 36 Miss., 681, which is attacked by counsel for appellant, that will justify the court in modifying the opinion heretofore rendered.     We have conceded that all the prerequisites in the matter of the lease to Shackleford were complied with.     It is, however, contended that this lease is governed by the act of 1850.     This would make no difference, as that act is explicit as to the lien reserved for the purchase money.

That the lease by the board of supervisors to appellant, in 1879, conferred no title is too plain for argument.     The statute under which the board acted had been repealed, and appellant, in dealing with the board, was charged with knowledge of their lack of authority.

Appellant cannot invoke the statute of limitations, because it has not run against the state since 1877; if it did, appellant would be estopped, under the circumstances, to set it up. Whether the title is in the United States or in the state, the statute of limitations cannot be invoked. By an act of congress (May 9, 1852), the state was allowed to lease these lands. The several acts of congress left the legal title in the United States, subject to be divested by the state through any agency it might appoint for the purpose specified in the act, and none other. "The title is in the United States, subject to be divested by the state through any agency it might designate for the purposes specified in the several acts of congress, and none other." *Rabb* v. *Supervisors*, 62 Miss., 589. "The title to these lands is in the state, as trustee." 21 Am. & Eng. Enc. L., 843; *Long* v. *Brown*, 4 Ala., 622; 49 Ark., 172; 50 *Ib.*, 346; *State* v. *Springfield*, 6 Ind., 83; 16 Ohio St., 11; 34 Kan., 237.

The suit is only brought in the name of the county because the statute so directs. Code 1892, § 4147. The title being in the United States or in the state for the education of the children, no statute of limitations has run since 1877.

Jones, having gone into possession as vendee or lessee, cannot now be heard to set up an outstanding title that existed at the time of his purchase or lease. If it be a fact that he purchased of complainant, he is estopped now to set up that, at the time he received his lease, complainant had no interest in the land. The tenant, in any action brought by his landlord for his reversion or fee, cannot be heard to say that, at the time he went into possession, his landlord had no title. Besides, the county, by its reconveyance from Shackleford, acquired the color of title, and Hill was barred by the statute of limitations, and it would not avail appellant to thus acquire title. *Griffin* v. *Sheffield*, 38 Miss., 359; *Heard* v. *Baird*, 40 *Ib.*, 793. Besides, appellant has not shown that he has any connection with this outstanding title. 6 Am. & Eng. Enc. L., 245. A

tenant may show that the title of his landlord has been vested in another since he accepted the lease.    58 Miss., 881; 67 *Ib.*, 142.    Jones has acknowledged the title of complainant and treated it as his landlord, and he is precluded from showing that he had no title at the time the lease was granted.    2 Taylor on Landlord and Tenant, § 705 and notes.    The tenant cannot buy in an outstanding title and assert it against the landlord.    *Ib.*, p. 300, and cases cited.    On the same subject, see *Brown* v. *Supervisors*, 54 Miss., 230; Tyler on Ejectment, 559.

*F. B. Pratt*, on the same side.

I cannot see that the question as to the cession by the state of Georgia cuts any figure in this case.    Conceding all that is claimed, it simply amounts to this:    That the state may deal with these lands as the trustee for the inhabitants of the townships, as the legislature deems best, regardless of the acts of congress requiring consent of the inhabitants.    This is all immaterial, since we agreed that the prerequisites to the lease were all complied with, and this includes the admission that the inhabitants of the township consented to it.    The act of 1850, under which it is now claimed the lease was made, was a purely local act.    By its terms, it required the vote of Madison county to give it effect.    There is nothing in the record to show that the county ever voted upon that act, and it devolves upon appellant to show that an election had been held.    The act must, therefore, drop out of sight in the consideration of this case, and the lease must be referred to the act of 1852, under which, as the purchase money had never been paid, Shackleford acquired no title.    As to the contention that the statute of limitations protects Jones in his present possession, having occupied same since 1879, it is sufficient answer to say that the title is in the state, and never was in the county or in the township trustees.    If it be the purpose of the court in this case to investigate the whole history of these lands, and review all questions and ad-

judications concerning them, and to overrule any former decisions which are found to be erroneous, then we contend that the statute of limitations never ran against counties in cases of this kind, where they represent rights of a public nature, and where they hold merely as trustees. *Madison County* v. *Powell*, 71 Miss., 618; *Brown* v. *Supervisors*, 54 *Ib.*, 230, and *Clements* v. *Anderson*, 46 *Ib.*, 581, should be overruled, as they are clearly erroneous, and without precedent. Dillon on Mun. Cor., 675; 13 Am. & Eng. Enc. L., 714; 95 Ala., 134; 97 Ill., 88; Buswell on Limitations, § 99.

The reconveyance of Shackleford gave the state at least color of title to the term originally conveyed to Shackleford, and that was sufficient to set the statute of limitations to running in favor of the county. Besides, Jones claims under a lease from the state, and cannot now set up that the state had no title. The state was the owner of the fee, and even if the tenant, Hill, abandoned the term, the county, finding Jones in possession—a mere intruder, without any title—certainly has the right to eject him.

Argued orally by *W. L. Nugent* and *C. H. Alexander*, for appellant, and *H. B. Greaves* and *F. B. Pratt*, for appellee.

Cooper, C. J., delivered the opinion of the court.

The board of supervisors of Madison county, acting under the provisions of chapter 123, code 1892, caused this suit to be instituted in the name of the county against the appellant, to cancel, as a cloud upon the title of the public, his claim to section 16, in township 8, range 1 west, in said county. The lands were originally reserved for the benefit of the inhabitants of the township as school lands. The history of the title thereto, chronologically stated, is as follows: On April 14, 1851, the board of school trustees of the township leased the lands to Thomas Shackleford for the term of ninety-nine years, and for the purchase price Shackleford executed his promissory

notes.   On January 23, 1861, Shackleford conveyed his un-
expired term to one Hill, who entered into possession.   Hill
executed his notes for the purchase price, payable to Shackle-
ford, but died before paying the same, being insolvent.   In
the year 1868, Shackleford procured a decree for the enforce-
ment of his vendor's lien on the land by sale thereof, but no
steps seem ever to have been taken to have execution thereof.
In the year 1869 suit was brought against Shackleford upon
two of the notes he had given when the lease was made to him
in the year 1851, which was agreed to be dismissed if he would
reconvey to the proper authorities the unexpired term of his
original lease.   Nothing was done in execution of the agree-
ment by him until March 20, 1877, when he made conveyance
thereof to the president of the board of supervisors, that body
having been substituted by the code of 1871 in place of the
board of township trustees of schools.   On the twenty-fifth of
March, 1878, the board of supervisors of Madison county pro-
ceeded, as directed by chapter 39 of the code of 1871 (which
chapter, in so far as it authorized action to lease school land,
had been repealed by the act of March 5, 1878—Laws 1878, p.
114), to take a vote of the resident householders in the town-
ship whether the lands should be leased, and, the vote being in
favor of the leasing, leased the same on May 19, 1879, to the
appellant for the term of fifty years.   The appellant paid the
purchase price of said term, and went into possession of the
lands, and since that time has been in the peaceable and adverse
possession thereof.   This suit was commenced on September
13, 1893.   The bill simply charges that the lands are a part of
the school lands of the county, and that the defendant asserts
some claim thereto, which complainant prays may be canceled
as a cloud.   The defendant, by his answer and cross bill, dis-
closes the history of the title we have given, as to which there
is no controversy, and, in addition thereto, sets up and relies
upon two tax titles, as to which no reference need be made.
In addition, he pleads a title in himself (if the conveyance to

him by the board of supervisors be decreed void), acquired by adverse possession for more than ten years under claim of title.

The questions involved, and which are necessary to be decided, are: (1) Was the lease for the term of ninety-nine years to Shackleford, made in the year 1851, a valid one? (2) If it was a valid lease, was the unexpired term thereof reacquired by the public by the conveyance made by Shackleford on March 20, 1887? (3) What right, if any, passed to Jones by virtue of the conveyance made to him by direction of the board of supervisors on May 19, 1879? (4) If Jones acquired no title by such conveyance, has he acquired title by adverse possession, which he may invoke against complainant in this proceeding?

The case was submitted to us at the last term of this court upon concession by counsel for all parties that the lease of 1851 was made under the act of February 24, 1842 (Hutch. Code, p. 222). It was then conceded by counsel for the county that the lease then made was, in all respects, a lawful one; but, since it affirmatively appeared that Shackleford had not paid the purchase price, and, since the act of 1842 expressly provided that, "in no case of sale or lease shall any title vest in the purchaser or lessee until the whole of the purchase money, with interest, shall be paid," we held that the title of the land had never passed out of the United States, that no statute of limitations ran against it, and that the appellant acquired no title by virtue of the conveyance made to him in May, 1879, because the board of supervisors were not then authorized by law to lease the lands, and, for these reasons, we affirmed the decree of the chancellor canceling all claim of title asserted by the appellant. After the decision of the cause, it was discovered by counsel for appellant that, in the year 1850 an act had been passed, entitled "An act to reduce into one the several acts heretofore passed in relation to the sixteenth sections and common schools, so far as relates to Hinds county," and that some parts of the act (including the regulations for leasing school

lands) had been made to apply to the counties of Madison and
Claiborne, and, therefore, that the lease was made, not under
the act of 1842, but under that of 1850.    We thereupon or-
dered a reargument, and the cause is again before us for de-
cision.    Counsel for the county again protest that they have
never denied, and do not now deny, the validity of the lease
to Shackleford, and again argue the cause as though this is not
a question about which the court need concern itself.    But, in
our opinion, the question is one of great importance and of far-
reaching consequences.    Whether this lease was a valid one
depends upon two questions:    (1) Whether the act of the legis-
lature under which the lease was made was a valid law in refer-
ence to the leasing of school lands.    (2) Whether, if it was,
its terms were complied with by the officers charged with its
execution.

Now, it is evident that this court cannot, upon the mere con-
cession of counsel, declare a law to be valid or invalid, for the
rights of many others may, and probably do, depend upon the
decision of that question.    The facts relative to a particular
case may be settled by the agreement of the parties thereto,
for none but they have any interest in the results that flow
from the particular decision on the special facts.    But decisions
of questions of law must rest upon the judgment of the court
uninfluenced by the admissions of parties or of counsel.

The act of 1850, under which the lease was made, repealed
all prior laws in relation to leasing school lands so far as they
related to school lands in the counties to which it applied;  there
was, therefore, no other law under which school lands in those
counties might be thereafter leased.    This act contained no pro-
vision for obtaining the consent of the inhabitants of the town-
ship to the leasing of the school lands.    The question, then, is
whether a lease of the school lands might lawfully be directed
or authorized by the legislature to be made without providing
·by law for obtaining such consent.

The lands in controversy form a part of the territory in-

cluded in the cession made by the state of Georgia to the United States on the twenty-fourth day of April, 1802, by the fifth article whereof it was agreed between the contracting parties "that the territory thus ceded shall form a state, and be admitted as such into the union as soon as it shall contain 60,000 free inhabitants, or at an earlier period, if congress shall think it expedient, on the same conditions and restrictions, with the same privileges and in the same manner, as is provided in the ordinance of congress of the thirteenth day of July, one thousand seven hundred and eighty-seven, for the government of the western territory of the United States; which ordinance shall, in all its parts, extend to the territory contained in the present act of cession, that article only excepted which forbids slavery." · By the act of congress of March 3, 1803, provision was made for the survey and sale of the public lands in this territory, but by the twelfth section thereof all sixteenth sections were "reserved in each township for the support of schools within the same." In 1815 (3 Stat. at Large, 163), congress passed an act providing that the county courts in the territory should each appoint five commissioners to lease the school lands and apply the proceeds of each section to educational purposes within the township; and it was provided that all such leases should cease and be terminated on the first day of January next succeeding the establishment of a state government in said territory. The first act passed by the legislature of the state (February 5, 1818) authorized the justices of the county courts, or a majority of them, to make leases of the lands. By the act of November 26, 1821, the governor, secretary of state, attorney-general, treasurer, presiding judge of the supreme court, and the chancellor of the state for the time being (changed by the act of January, 1823, by omitting the attorney-general, judge of the supreme court and chancellor), together with three persons to be chosen by joint ballot of the general assembly, were constituted a body politic, under the name of the "president and directors of the literary fund,"

and were authorized to make leases of the school lands, and the proceeds were directed to be applied, under the direction of the school commissioners of each county, to the building of school houses in the townships wherein the lands reserved are situated.    The act of February 27, 1833, first contained a provision for obtaining consent of the inhabitants of the township, as a condition to the lease thereof.    Since that time all our general laws seem to have required such consent to be first obtained, but laws for particular counties sometimes omitted this requirement.    In 1852 (10 Stat. at Large 6) congress passed the following act: "1. That the legislature of the state of Mississippi shall be, and is hereby, authorized to sell and convey in fee simple, or lease for a term of years, as the said legislature, may deem best, all or any part of the lands heretofore reserved and appropriated by congress for the use of schools within said state, and to invest the money arising from said sales, as said legislature may direct, for the use and support of schools within the several townships and districts of country for which they were originally reserved and set apart, and for no other use or purpose whatever; *provided*, said lands, or any part thereof, shall in no case be sold or leased without the consent of the inhabitants of such township or district, to be obtained in such manner as the legislature of said state may by law direct; *and provided further*, that in all cases the money arising from the sale of lands within a particular township and district, shall be appropriated to the use of schools within that township and district.

"2. *And be it further enacted*, that sales heretofore made by the authority of the legislature of the state of Mississippi of lands reserved and appropriated as aforesaid, are hereby ratified and approved in the same manner and to the same extent as if this. act had been in force at the time of said sales."

In 1859 the case of *Hester* v. *Crisler*, 36 Miss., 681, came before this court, and the opinion therein has given color to and controlled subsequent decisions.    In that case a lease had

been made under. the act of 1833, by persons exercising the office of trustees of the township, and Crisler, the defendant, claimed under the lessee who had paid the purchase money. It was insisted that the persons who acted as trustees were not regularly such, and that, for this reason, and also because the consent of the resident heads of families in the township had not been first obtained, the lease was void. It appeared, however, from the record, as the opinion states, that upon the petition of a majority of the resident heads of families in the township, the legislature passed an act March 2, 1846, ratifying and confirming said lease. The court held that the defective lease had been validated by this act of the legislature and by the ratification contained in the act of congress of 1852, construing the act of congress as ratifying and approving all sales previously made by state authority, whether the consent of the inhabitants of the township had or had not been obtained, on the ground that the act could not have intended to require the assent of the inhabitants as a prerequisite to its operation. This was a manifest misconstruction of the act. By its express terms no sale or lease of the lands could be made "without the consent of the inhabitants of such district," and the section ratifying and approving past sales was not a ratification of all sales previously made; they were ratified and approved "in the same manner and to the same extent as if this act had been in force at the time of said sales." Now, if the act had been in force at the time any particular precedent sale was made, it is manifest that, to be valid, the condition of securing the consent of the inhabitants must first have been complied with. Surely, if congress had power over the subject, it might approve one or all precedent sales, and to such "extent" as it deemed proper, and it is entirely certain that the decision in *Hester* v. *Crisler* ignores and nullifies so much of the act as declares the ratification to be "in the same manner and to the same extent as if this act had been in force at the time of the sale."

In *Connell* v. *Woodard*, 5 How. (Miss.), 665, decided in

1841, the point was made that the reservation by congress of the sixteenth sections for the use of schools, was not a grant to the state, so as to authorize the various acts of the legislature, which had, from time to time, been passed authorizing the leasing or sale thereof. The court refused to consider the question, saying: "This power has been so long recognized and acted on, that we do not feel inclined to question it at this time, even if we entertained any doubt of its existence." But in *Hester* v. *Crisler*, the court declared that it was "apparent, from an examination of the various acts of congress, that until the passage of the act of 1852, the government of the United States retained the legal title to the land in controversy, as well as all other sixteenth sections reserved from sale by the act of 1803, for the support of schools in the townships. It is equally clear that, whatever may have been the intention of congress or the benevolent purposes of the act of 1803, no power was ever conferred, by any direct proceeding or act, upon either the state, the township or the trustees, to carry into effect the purposes of that act after the act of January 9, 1815, until the act of May 19, 1852; and it is by virtue of this last act alone that 'the inhabitants of the township or district' acquired the right to consent or not to the sale or lease of these lands, or any other right. Whatever the state of Mississippi may have supposed, nothing can be more certain than that she held no title, legal or equitable, to these lands, for herself or in trust, until the act of 1852. And before then, her authority, except so far as it has been sanctioned and ratified by the government of the United States, by that act and the act of 1857, had been permissive, *sub silentio* and was but an assumption. The reservation from sale for the support of schools in the townships in 1803 (fourteen years before the state of Mississippi had an existence, and long before any township in its limits was settled) could not be regarded as a grant to the state, or to such townships, either directly or in trust. Indeed, it is apparent, from the

subsequent action of congress in 1815, that these lands were regarded as under the control of the government of the United States at that period. There was not even a trust created by the act of 1803, for the very sufficient reason that neither the trustee nor the *cestui que trust*, now supposed to have been contemplated by the act, was then in existence." From the time of this decision to the present, this court has followed along the line of its argument, and, in many cases, has referred to the titles of these school lands as remaining in the United States, and has deduced all right on the part of the state to deal with them as depending upon the grant of power conferred by the act of 1852. The question has never since been agitated or considered. It was not properly and fully examined by the court in *Hester* v. *Crisler*, and, unless the supreme court of the United States and the courts of several of the states are in error, the decision in that case cannot be sustained. The error in *Hester* v. *Crisler* is, and it is one going to the very root of the question, that the court accepted the act of congress of 1803 as the original act by which these lands were devoted to school purposes for the benefit of the inhabitants of the townships in which they are situated. Beginning with the postulate that these lands belonged to the United States, to be dealt with at its will, and, therefore, that the right of the inhabitants of the township sprang from a donation by congress, the conclusion that the state had only such power as had been given by congress would be a correct one. The mistake in the conclusion arises from the fact that the postulate is erroneous. The right of the inhabitants of the townships to have the lands for school purposes arises, not from the act of congress, but from the act of cession by the state of Georgia of 1802. That state, and not the United States, is the donor. The United States never had the shadow of a right to these lands, save as trustee for the inhabitants of the prospective states which the act itself stipulated should be created. Let us examine the subject in the light of decisions else-

where, in which the true origin of the grant or reservation has been considered.

The state of Alabama was created out of a part of the territory ceded by Georgia. In 1843 the question was presented as to the character and derivation of its title to the school lands, in the case of *Long* v. *Brown*, 4 Ala., 622. An act of congress had been passed authorizing the state to sell the lands with the assent of the township. The state then passed an act authorizing the sale of the lands upon the assent of the inhabitants, to be ascertained by a vote of the qualified electors. The validity of a sale made under. the act was challenged upon the ground that the act of congress required assent of the inhabitants of the township, while the act of the legislature authorized sales to be made by the consent of the qualified electors. The court traces the history of the sixteenth sections back to the ordinance of 1787 "for the government of the territory of the United States northwest of the Ohio river," saying: "By the third section of that instrument it was declared that, 'religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall be forever encouraged," and, at the same time, while authorizing the treasury to contract for the sale of the western lands, required the lot 16 in each township to be given in perpetuity for the purposes contained in the ordinance." 1 Story's Land Laws, 361, 362. "By the fifth clause of the first 'articles of agreement and cession between the United States and Georgia,' in 1802, by which the United States acquired the right to the territory now composing the states of Alabama and Mississippi, it was declared that the territory then ceded should, when sufficiently populous, form a state, and be admitted to the union 'with the same privileges and in the same manner as is provided in the ordinance of congress of thirteenth of July, 1787, which ordinance shall, in all parts, extend to the territory contained in the present act of cession, that article only excepted which forbids slavery.' . . The act of congress of March 2,

1819, for the admission of Alabama into the union declares ' that the section numbered sixteen in every township, and when such section has been sold, granted or disposed of, other lands equivalent thereto, and most contiguous to the same, shall be granted to the inhabitants of such township for the use of schools.' This grant by congress cannot properly be called a ' donation.' It was the performance merely of a solemn obligation created by the compact with Georgia, and was intended as a grant to the state, to be held in perpetuity for the use and benefit of the inhabitants of the township. The legal title to these lands could not vest in the inhabitants of the township, as they had no corporate existence, nor could such capacity be conferred on them by the act of congress, and, it is very certain, was not intended to be conferred; nor can any doubt be entertained that the legal title was intended to be vested by the act of congress in this state, and did so vest, by the acceptance of the conditions proposed by the act of March 2, 1819. . . By the acceptance of this trust, the state impliedly stipulated to do those acts which were necessary to give full effect to the grant. . . As the land in its wild state was of no benefit to the people of the township, and as revenue could only be derived from it by cultivation, . . application was made to congress by the legislature for leave to authorize the sale of the sixteenth section, by the assent of the township, which was granted. . . We agree entirely with counsel for the plaintiff in error that this act conferred no power; nor had congress any right whatever to interfere in the matter. It is, however, evidence of the strong desire of the legislature to act in good faith, and to keep within the pale of the law. . . We are therefore of opinion that the grant of sixteenth sections is in perpetuity to the inhabitants of the respective townships; that the legal title to the land is in the state, in trust for the inhabitants of the respective townships in which the land is situated, and that a sale of the land, pursuant to the act of the legislature, is valid and binding on the inhabitants of the

township.'' In *Gaines* v. *Nicholson*, 9 How., 365, the supreme court of the United States declared that '' the state of Mississippi acquired a right to every sixteenth section, by virtue of these acts, on the extinguishment of the Indian right of occupancy, the title to which, in respect to the particular sections, became vested, if vested at all, as soon as the surveys were made and the sections designated. No patent was necessary or is ever issued for these school sections.'' The observation of the court that the title vested on the survey, '' if vested at all,'' was because the adverse claim was under an Indian reservation, which, if valid, was superior to the right of the public to the land. In *Cooper* v. *Roberts*, 18 How. (U. S.), 173, the right of the state of Michigan to one of the sixteenth sections was involved. In delivering the opinion of the court, Judge Campbell said: '' The state of Michigan was admitted to the union with the unalterable condition ' that every section No. 16 in every township of the public lands, and, where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the state for the use of schools.' We agree that, until the survey of the township and the designation of the specific section, the right of the state rests in compact, binding, it is true, the public faith, and dependent for execution upon the political authorities. Courts of justice have no authority to mark out and define the lands which shall be subject to the grant. But, where the political authorities have performed this duty, the compact has an object upon which it can attach, and, if there is no legal impediment, the title of the state becomes a legal title. The *jus ad rem*, by the performance of that executive act, becomes a *jus in re*, judicial in its nature, and under the cognizance and protection of the judicial authorities, as well as the others. *Gaines* v. *Nicholson*, 9 How. (U. S.), 356.'' This case involved a controversy between a claimant under the laws of congress in reference to mineral lands, and one under the state claiming the section as school lands. In the opinion from which we have quoted, the history of the school

lands is fully discussed, and it is declared that a uniform, general public policy had existed since the ordinance of 1785, devoting these central sections in the townships to educational purposes in all the states formed from the territories. The case was again before the court, and is reported in 20 How., 467. The court, again speaking of the sanctity by which these lands had been pledged to school purposes, the character of the rights of the states thereto, and of those exceptions which could alone justify the United States in dealing with them for other purposes, said: "The power vested in the president to reserve from sale such portions of the land as he should deem necessary, for public uses, may be classed as one of those paramount considerations constituting a public or national necessity, reaching even to the defense of the country by fortifications and arsenals." In the same category may be placed the sanctimony of the rights of property and possessions existing and vested in territories anterior to their acquisition by the United States—rights guaranteed by treaty stipulations. In the same light may be viewed the withholding temporarily from sale lands in which were minerals and salt springs. All these restrictions or reservations are exceptions merely, and should be carried no further than their terms expressly or necessarily require. They can, with no propriety, be regarded as forming in themselves a system, much less as overturning a system designed to be, as far as practicable, general and uniform, and proclaimed from its origin to be founded in wisdom and in a solemn sense of public good, and, as such, to be fostered and sustained. Every new state has come, and will come, into the union relying on the faith of this pledge; and, even with the concession of a power in the government to violate that pledge, such a violation could be referred to no principle of justice, and should, therefore, never be imputed, but upon proofs the most positive and unequivocal. The sixteenth section of each township could not, it is true, be specifically designated and possessed anterior to a survey of the public lands;

but the right to that section and its appropriation existed in contract or pledge by virtue of the ordinance and the laws of the United States, and the right of possession and enjoyment was matured by the execution of the surveys." In *Hedrick* v. *Hughes*, 15 Wall., 123, it was held that when the sixteenth section had been disposed of and other lands selected in lieu thereof under an act of congress, it was not necessary that a patent should be issued therefor, the court saying: "It is certainly true that neither the act of 1820 nor that of 1823, of themselves, transferred the title of the lot in question from the government to the state of Missouri. The sixteenth section of land having been disposed of, it required a designation of some other lands, in the manner pointed out by the statute, to take its place. Until such designation was made, it is evident no title could pass; but such designation and entry were all that the law required to be done. No patent was necessary for the substituted lots any more than for the sixteenth section itself, had that been undisposed of. See, in addition to these authorities, *McCreery* v. *Haskell*, 119 U. S., 327; *Howell* v. *Stanson*, 83 Cal., 539, and other cases cited in 19 Am. & Eng. Enc. L., 361, note 1.

We have found no decision elsewhere than in this state (and all our cases rest upon *Hester* v. *Crisler*) in which it has been held that the title to school lands, or any control over the same, remained in the United States after the organization of the state and the survey and designation of the lands. We have quoted at length from the opinions of the supreme court of the United States, to demonstrate the error into which this court fell in *Hester* v. *Crisler*, and to show that, by virtue of the compact between Georgia and the United States as to the lands situated in this state, and by reason of the great and uniform public policy of the United States as to states formed from other territories, there is pledged to the several states, for the use of the inhabitants of the several townships, all sixteenth sections of land, and that title thereto passed to the state by reason of the

survey and designation of the land, without the necessity of a patent or grant by special law.

If the decision in *Hester* v. *Crisler* established a rule of property, we should, notwithstanding its manifest error, be strongly inclined to yield to it, upon the rule of *stare decisis*. But it does not, and the general investigation of the title to school lands now being made under the provisions of the code of 1892, will probably bring under examination many cases in which leases of land have been made under various statutes, both before and since the passage of the act of congress of 1852, in which no provision has been made for securing the consent of the inhabitants of the township. The present case and that of *Board of Sup'rs of Lauderdale Co.* v. *East Mississippi Mills*, 18 So. R., 94, now before us, and which will be controlled by this opinion, are both cases in which it is conceded that the leases were made in strict conformity with the statutes of the state, but in neither case was the consent of the inhabitants of the township obtained that the leases should be made. Tested by the state laws, these leases are valid; tried by the act of congress, they are void. How many local acts are hidden among our statute laws time alone can show. That many of these contain no provision for obtaining the consent of the inhabitants of the township we doubt not. No fitter time for correcting the errors of our former decisions can occur, and, accepting the decisions of the supreme court of the United States as authoritative, we overrule the decision in *Hester* v. *Crisler*, and all other cases that have since followed it, as to the question here involved and decided. We are now prepared to accept the concession of counsel that the lease to Shackleford was a valid one, and vested in him a term of ninety-nine years from the date of its execution.

The second and third questions presented are of ready solution:

2. Shackleford passed no title by his conveyance of March 20, 1877, for he had then no title, legal or equitable, to convey. He had conveyed all right he had in the land to Hill, and had reacquired none.

. 3. Jones secured no interest in the land by virtue of the lease made to him by direction of the board of supervisors on May 11, 1879. The statute under which they attempted to convey had been repealed for more than a year when that lease was made, and the board was without a shadow of authority to deal with the land. A convention of overseers of the public roads might as well have attempted to make the lease.

4. May Jones, the appellant, invoke, as against the county, title derived from adverse possession? Before beginning the consideration of this question, we will state here, as the most appropriate place, that there is a written agreement of parties as to the condition of the land from the year 1865 to the year 1879, and of the character of the occupancy of appellant since that time. That agreement is " that no one was in the actual possession and occupancy of said land from 1865 to 1879, but that said section 16, township 8, range 1 west, was a common pasture and old field, uninclosed and uncultivated during said time; . . that since July 20, 1879, the said defendant, W. B. Jones, has held, and is now in, the open, notorious and continuous adverse possession of said lands, claiming them under lease from the county, or under said tax sales and lease, as owner." It is suggested in argument by counsel for the county that Shackleford was in possession of the land when he conveyed to the county in 1877, having entered and displaced the former possession of Hill, his delinquent vendee. This is in the face of the agreed facts. In 1868, Shackleford was pursuing the estate of Hill as his debtor, and seeking to condemn the land as a part of his estate for the unpaid purchase price; and the agreement is that, from the year 1865 until Jones went in under his alleged lease in 1879, the lands were not actually occupied or possessed by anyone.

It is evident that, leaving out of consideration the claim asserted by the county, Jones has, on the facts agreed, acquired by limitation the title of Hill to the unexpired term of the Shackleford lease, and is the true owner thereof. But the county contends that, since he entered upon the lands in recog-

nition of its title, and received possession from its officers, he is precluded from setting up the outstanding title of a third person, or of asserting such title if acquired by himself, or of denying the title of it, his lessor.  If we appreciate fully the position of counsel, it may be thus stated: Jones is in possession of the land as the tenant of the county, at will or on sufferance, and if, by the lapse of time, the title of the Hill heirs is barred by limitation, the estate, which would ordinarily be acquired by the occupant personally, inures by estoppel to the county, the landlord of the occupant.  In other words, that the county can put Jones out of possession, because he entered under it, by virtue of a lease it now repudiates, and, having secured possession of the land, may hold it against the Hill heirs by reason of Jones' adverse holding for the statutory period.  We deduce these conclusions from the two contentions put forward by counsel: (1) That Jones is estopped to deny its title; (2) that he cannot set up the outstanding title of the Hill heirs, because that is barred by limitation.

The principles of estoppel by which a tenant is precluded from denying the title of his landlord have been extended and applied, in the furtherance of justice and the prevention of frauds, to the relations existing between vendor and vendee, whenever, by reason of the contract of the party or the condition or terms of the conveyance under which he claims, he owes a duty to the vendor.  In the present case no reason exists why a different rule should be applied as to the term for which the defendant contracted than if the case were one in which the lessee had taken an assignment of the whole interest of his lessor.  He undertook to buy a term of a definite and fixed duration, and, having fully paid for the same, owed to his lessor no other duty than not to do any act in derogation of the reversion.  In *Brown* v. *Supervisors*, 54 Miss., 230, decided at a time when the statute of limitations ran against the state and its subdivisions as well as against private persons, it was held that one who had taken a void lease to school lands might

plead a title acquired by limitation as against his lessor, for the term he had bought, but not as to the reversion. The opinion of the court was delivered by Chalmers, J., who, with his usual accuracy and precision, thus states the rule: "But it is said that the instrument in question was only a lease for ninety-nine years, and that Gregory and his vendees were but tenants and assignees of the tenancy under the plaintiffs, and that the possession of a tenant is never adverse to his landlord. This is confounding two wholly different things—to wit, the setting up of an adverse title outside of the lease and an adverse holding under it. A tenant may not set up any claim adverse to the title of his landlord, or, in other words, may not question his landlord's title. But when the attempt is to oust him upon the allegation that he never had a lease, and the question is, whether in point of fact such a lease ever existed, he may rely upon his possession, not as adverse to his landlord's title in fee, but as really in subordination to it, though adverse to the landlord's claim of immediate possession. He acknowledges his landlord's right to the reversion, but claims that he holds a term for years; and, as to this claim, he may rely upon a possession sufficiently prolonged to toll the right of entry." If the law now was that the statute of limitations ran against the county and state, as it did when *Brown* v. *Supervisors* was decided, that case would be conclusive of this. But statutes of limitation do not now run against the state and counties, and it is supposed by counsel that this fact takes this case from the control of that decision. This is a mistake. Counsel mistake the illustration for the rule. The principle is that, when the lessee has paid for the term, he owes no duty to his landlord, except not to dispute his title to the reversion. The term then becomes the property of the tenant, and, in defense of that, he may fight the landlord "tooth and nail," as he may a stranger. He may use any weapon he may find in his arsenal in defense of his term. If the statute of limitations is available, he may shelter behind that; if it is not, he may resort to any defense

which does not controvert the reversionary right of the landlord nor violate the terms of his own contract. It is true the statute of limitations, as against the county's title, cannot now be invoked; but when the law was that it could be, its effect was that the defendant had acquired that title by adverse possession. Title of the county derived from the statute is not pleaded by the defendant. He shows that the county had no title, but that it was in the heirs of Hill, and that this title he has acquired by limitation. Jones was a purchaser of the term, and if the county, as it may do, repudiates the validity of the lease, it cannot, by the contract it rejects, bind Jones by estoppel arising from it to contest on any ground the demand made against him. As was said in *Blight's Lessee* v. *Rochester*, 7 Wheat., 535, and in *Watkins* v. *Holman*, 16 Pet., 25, and *Croxall* v. *Shererd*, 5 Wall., 268, the vendee of land who has received a conveyance and paid the purchase price, holds for himself, and not for the vendor. "He may disclaim the title under which he entered, and set up any other title and any other defense against his vendor and against others." See, also, *Macklot* v. *Dubreuil*, 9 Mo., 473. And so are the decisions in this state. *Brown* v. *Supervisors, supra; Niles* v. *Davis*, 60 Miss., 750; *Moring* v. *Ables*, 62 *Ib.*, 263.

*The decree is reversed and the bill dismissed.*