WARREN COUNTY *v.* MILDRED HUNT LAMKIN.

[46 South., 497.]

1. LIMITATION OF ACTIONS. *Exceptions. Sovereignty.*
   Exceptions to the statutes of limitation in favor of sovereignty
   must be strictly construed against the sovereign.

2. SAME.   Code 1871, § 2247.   *Code* 1880, §§ 2664, 2668.
   The ten year statutes of limitation (Code 1871, § 2247, Code 1880,
   §§ 2664, 2668) applies against a county to bar an action of eject-
   ment by it to recover the possession of land, not devoted to a
   public use, held under a void lease from the county, and vest
   in the lessee and his assignees an unassailable title for the term
   of the lease.

FROM the circuit court of Warren county.

HON. THOMAS G. BURCHETT, Special Judge.

Warren county, appellant, was plaintiff in the court below;
Mrs. Lamkin, appellee, was defendant there. The suit was ej-
ectment. From a judgment in defendant's favor the plaintiff
appealed to the supreme court. The facts are stated in the opin-
ion of the court.

*R. V. Fletcher,* attorney general, for appellant.

This is an appeal from the circuit court of Warren county. In 1872 the board of supervisors of Warren county undertook to lease for a term of ninety-nine years to one George McCarthy a certain parcel of land situated in the city of Vicksburg, which land was a part of a larger tract bought by the county for jail purposes. The lease executed by the president of the board to McCarthy recites that the consideration should be the sum of $862.50, the legal interest to be paid annually to said board of supervisors or their successors in office, with the privilege of said McCarthy "extinguishing the debt at any time by paying the principal and amount of interest due." This deed was made pursuant to an order of the board of supervisors, and it is conceded that, since the board had no authority to make such a lease, it is absolutely null and void. On the 23d day of January, 1873, McCarthy executed a lease to Chas. H. Smith of a part of this land for a cash consideration of $500 and the undertaking by Smith to pay his proportion of the interest required by the contract of lease. In November, 1877, the leasehold interest of Chas. H. Smith was sold to the Vicksburg Benevolent Society of Vicksburg, under a decree of the chancery court; the consideration being $750, payable in installments. In August, 1907, this corporation conveyed the land to Mrs. Lamkin, the appellee; the consideration being $900 in cash. The county brought ejectment on the theory that the lease to McCarthy was void, as being beyond the power of the board to make, and the defense is that the title of appellee has been perfected by adverse possession. The case was tried on an agreed state of facts, and one clause of the agreement provides "that if it be decided by the court that plaintiff has no right of action in the circuit court, but has a right of action in the chancery court, then the case is to be transferred to the chancery court; and this is true of the supreme court, if the case should reach that tribunal." The court below held that the county could recover neither the land nor the purchase money, since claims for both were barred

by the statute of limitations. Since the claim for the purchase money was barred, it would be useless to transfer the cause to the chancery court for any purpose, and judgment final was therefore entered for defendant.

As stated, the case was tried on an agreed statement of facts, and the only recital in this statement as to adverse possession is as follows: "From May 8, 1892, George McCarthy and those deriving title through him, including Mrs. Lamkin, have been in open notorious possession of the said property, claiming the right to hold such possession during the whole term of the lease executed on that day to McCarthy." This statement by no means comes up to the standard necessary to show adverse possession. It does not show that the possession was actual, continued, exclusive, and hostile. The possession might be open and notorious, and yet lack some of the other essential elements. *Hicks* v. *Steigleman,* 49 Miss., 377; *Dixon* v. *Cook,* 47 Miss., 220; 13 Enc. Pl. & Pr., 286 *et seq.* But, assuming that the agreed statement of facts sufficiently shows adverse and continued holding, we come to the heart of this case.

It will be seen from the agreed statement that the county purchased this land in 1840 and erected a jail on the western part thereof. We may therefore safely assume that the land was purchased for jail purposes, and was held by the county from 1840 to 1872 as property set aside and appropriated for the use of the public, upon which to maintain county buildings—jail, courthouse, poorhouse, or whatever might be necessary for the use of the county. Doubtless this property was purchased under the authority conferred upon boards of police by the act of June 28, 1822. This act provides: "Every courthouse and jail, to be erected as aforesaid, shall be formed of such material, and be of such dimensions, as shall be directed by the justices of the county court, or a majority of them, in each county, who are hereby authorized to accept as a gift, or to purchase for the use of the county, so much ground, in the towns or other places where the courts may be ordered to sit, as they may judge con-

venient and necessary whereon to build all or any of the structures aforesaid, which purchase money shall be paid by the proper county, and laid in the county estimates." Hutch. Code, p. 708, c. 51, art. 4, § 1. It will thus be seen that the property was not acquired for the purpose of resale or disposition by lease, or in any other manner, but was held in trust by the county for the purposes for which it was acquired. The board of supervisors had no authority to lease it for ninety-nine years, or for any other term, nor was there authority anywhere, except perhaps in the state legislature, to dispose of it. The board may as well have undertaken to sell the courthouse, the jail, or any other public building of the county. This being the character of the property dedicated, as it were, to a public use, held in trust for the public, can the county's title be lost by prescription, however long continued?

It is said that from 1871 to 1880 the statute of limitations ran against the county by express provision of law, and that from 1880 to 1890 the common-law doctrine on the subject was in force, and that at common law statutes of limitation ran against counties, as held in *Clements* v. *Anderson,* 46 Miss., 581. This may all be safely conceded without shaking the force of the county's contention in this case. *Clements* v. *Anderson,* dealt with swamp and overflowed lands granted to the state for purposes of internal improvement, and by the state ordered to be disposed of to individuals for a certain consideration. This land was salable—held for sale. It was not held in trust for the public, in the sense that it could never be disposed of. When the opinion in the case holds that the statute of limitations runs against the county, it has reference to claims or rights which may be acquired or lost by prescription—matters to which ordinary statutes of limitation apply. If it can be shown that the land in the case at bar is controlled by a different rule, because of its character and the nature of its holding, an entirely different rule would be applied. It should be noted in passing that the doctrine of *Clements* v. *Anderson* is based upon the theory

that the state is sovereign and that statutes of limitation do not apply to such. Would it not follow as a necessary corollary that property acquired by the sovereign, even through the medium of a subordinate agency, and held and used to carry out the purposes and will of the sovereign, is by parity of reasoning likewise exempt from the statute's operation?

And so in *Brown* v. *Issaquena Co.,* 54 Miss., 230, the case which furnishes the basis of the decision below, is susceptible of ready explanation. This was a suit over sixteenth-section school lands, which it was the policy of the law to dispose of by lease. The lands were useless for any purpose, except to furnish revenue to the schools by being leased. It was the privilege of any citizen to acquire them by complying with the statutory requirements. Occupancy by tenants was not foreign to the spirit and policy of the law, but entirely consistent therewith. The lease in this case was irregular, it is true—void, it may be admitted; but still some form of leasing was permissible, and the land was the subject of private ownership to the extent of the term. The same is true of the land involved in *Jones* v. *Madison County,* 72 Miss., 777, 18 South., 87; and upon identically the same principles were decided *Madison Co.* v. *Powell,* 71 Miss., 618, 15 South., 109, and other cases announcing the same doctrine.

Let us see how stand the authorities as to adverse possession in the case of lands such as are involved in the case at bar. So far as the operation of the statute is concerned there can exist no distinction between counties and municipalities. Many of the authorities cited herein refer to municipal corporations; but the doctrine is alike applicable to counties, or perhaps, since the county is but a quasi corporation—in truth a subdivision of the state, created for convenience in administering the law and consummating the purposes of government—it may be said that as to counties the doctrine is all the stronger. In *Vicksburg* v. *Marshall,* 59 Miss., 563, it is said: "The streets in an incorporated town are held by the corporation in trust for the public, and an adverse possession thereof by an abutting owner cannot bar

the right of the corporation to open it for public use. Dillon, Mun. Corp., § 675." This principle is reaffirmed in *Wither-sppon* v. *Meridian*, 69 Miss., 288, and is unquestionably the settled law of this state.

It will hardly be contended that the same rule would not apply to the public highways of a county, as well as the streets of a municipality. That they are to be classed together and made subject to the same rule is clear from the statement in 1 Am. & Eng. Ency. of Law (2d ed.) 878, where it is said: "The decisions of the courts as to whether title to highways, streets, parks, or other public property can be acquired against a municipal or quasi municipal corporation is supported by a long list of authorities." Reference to the notes on page 880 shows that Mississippi is classed as one of the states adhering to the doctrine that title cannot be acquired by adverse possession as against the title of municipal or quasi municipal corporations to highways, streets, parks, or other public property. In the case of *City of Bedford* v. *Willard*, 133 Ind. 562, 33 N. E. 368, 36 Am. St. Rep., 563, it is held that "the statute of limitations runs against municipal corporations, such as cities, towns, or counties, except as to property devoted to a public use, or held upon a public trust, and contracts or rights of a public nature." This case was decided in a state where all ordinary statutes of limitation ran against counties and municipalities, and clearly distinguishes between lands held for a public use and such as were held with a right to sell. I call special attention to the quotation contained in this opinion from Dillon on Municipal Corporations—a monumental authority.

A leading case on this question is that of *Ralston* v. *Weston,* 46 W. Va., 544, 33 S. E., 326, 76 Am. St. Rep., 834. This case overrules an earlier West Virginia case, that of *Wheeling* v. *Campbell*, 12 W. Va., 36, and the holding of the case is thus summarized in the syllabus: "The statute of limitations applies to municipal corporations and to the state in like manner as to individuals in similar cases; but it does not apply to the sov-

ereign rights and property of the people of the state, dedicated to the public use." The opinion is too lengthy for extended quotation, but while it deals primarily with streets, yet the principles there announced apply with equal force to all property held in trust for the public. Striking in its application to the case at bar, and clear in its distinction between the two classes of property, is this language found on page 838 of 76 Am. St. Rep., (46 W. Va., 524, 33 S. E., 326) : "So statutes of limitations, which are made to apply to the state, do not apply to the people or their public rights; but they only apply to the state in the same case that they apply to individuals. The entry upon or recovery of lands held for sale, suits on bonds, contracts, evidences of debt, or for torts—all these, though the state is a party, are subject to bar. As to all such things there is no reason why the state should have any longer time than an individual. Such is not the case with the right of taxation, the right of eminent domain, the right to use the public highways, and other rights, which pertain only to the sovereignty of the people. None of these can ever be lost by the negligence of the public servants, who have no power of disposal over them in any way whatever, except according to the express will of the people."

Attention is called to the illuminating note to *Schneider* v. *Hutchinson*, 35 Or., 253, 57 Pac., 324, in 76 Am. St. Rep., 474. The note is found on page 492, and the learned annotator, Judge Freeman, utterly repudiates the doctrine that statutes of limitation can run against municipalities or counties as to streets, highways, or other property dedicated to the use of the public. See the overwhelming list of authorities in the note on page 494 of 76 Am. St. Rep. This doctrine is clearly and forcefully stated in *Norrell* v. *Augusta Ry. & Electric Co.*, 116 Ga., 313, 42 S. E., 466, 59 L. R. A., 101. The Georgia court in this case uses this language: "While it may be entirely proper to apply the doctrine of adverse possession and prescription to a city in matters in which it is concerned in a capacity which is private rather than governmental in its nature, we think that adverse

possession by an individual of property held by a city for the benefit and use of the whole public should not be allowed to ripen into a prescriptive title. The city is in some respects not a division of the state; but it is at least an agent of the state, exercising within certain limits governmental functions and powers. If prescription does not run against the state, it should not run against a city in respect to rights which are intrusted to the city for the benefit of the public generally, and as to which it exercises governmental powers." I think I can safely rest this branch of the case just here.

But, if mistaken in these views, there is another consideration. It was expressly agreed in the court below that if, under the agreed state of facts, any relief could be granted the county in a court of equity, not obtainable in a court of law, the case should not be dismissed, but should be transferred to the chancery court. This had manifest reference to the obvious fact that the county, unless barred by limitation or precluded by a presumption of payment, would have a lien upon the property for the payment of the purchase money, or at least the interest on the same, which lien could only be enforced in a court of equity. The court below held that the debt was barred by limitation and that therefore no lien could be enforced. The language of the so-called lease is peculiar. It provides that the sum of $862.50 should be paid, the legal interest to be paid annually to the board of supervisors or their successors in office, with the privilege of said McCarthy extinguishing the debt at any time by paying the principal and amount of interest due. It would seem that the county could not enforce payment of the purchase money if it may be so called, but that it was left optional with the so-called lessee as to whether he would extinguish the debt or continue the payment of the annual interest charge. It was clearly the intention of the board of supervisors to treat this annual interest charge as a fixed rental, determined upon the basis of the actual value of the property. This being true, in the absence of proof that the money had been paid, what presumption of

law arises as to its payment? True enough it is that, when money is due at a time specified, it will be presumed to be paid, and statutes of limitation will bar suit to recover. But here the money was never due, but the privilege was given to the lessee to avoid payment by paying the annual interest. Suppose one borrows money upon a contract providing that he may pay before due if he wishes. Will the courts indulge the presumption that payment was made before the obligation becomes due? Surely not; and yet this is what was presumed by the learned judge below. If the money had never been paid, it is clear that the lessee owes the duty to pay interest annually, and can be held for all sums unpaid at least from the year 1890, when the statute of limitation ceased to run against the county. At common law a presumption of payment does not arise until the lapse of twenty years after the maturity of the obligation. 22 Am. & Eng. Ency. of Law (2d ed.), 591.

It follows that, even if recovery of the parcel of land is barred, the county still has a lien for the interest or purchase money and the case should be remanded to the chancery court of Warren county, where the county's lien can be enforced.

It is insisted in the brief for appellee that the operation of the statute of limitations does not at all depend upon the right of the county to sell the property, but depends solely upon the question as to whether it has been dedicated to public uses, and therefore held in a governmental capacity. While the distinction may not be important, still it was said in the West Virginia case of *Ralston* v. *Weston,* cited in the original brief, that "the entry upon or recovery of lands held for sale, etc.—all these are subject to bar." It would seem that this court at least recognizes the distinction between lands like school and overflowed and swamp lands, which are held for sale, and lands which are beyond the power of the county or municipality to alienate. It is strongly insisted that there is nothing in the record which shows that the particular piece of ground involved in this controversy was ever dedicated to public uses, and that, therefore,

the rule announced by our court in *Vicksburg* v. *Marshall,* and *Witherspoon* v. *Meridian,* has no application. But the very fact that the land was purchased under authority of a statute which authorized a purchase only for jail and courthouse purposes is itself a dedication to public uses. It must be remembered that not only is the board of supervisors without authority to sell lands which belong to the county, howsoever acquired, but it is equally without authority to expend the public money in the purchase of land, except as provided by law. The restriction upon the right to purchase is as operative as the restriction upon the right to sell. This land was bought in 1840, and in the absence of any showing to the contrary it must be presumed that the county authorities acted in accordance with the law. The statute authorized the board to purchase for jail and courthouse purposes "so much ground—so much as they may jugde convenient and necessary whereon to build all or any of the structures aforesaid." So that we may safely presume that the justices of the county court must have adjudged that this entire block of land was necessary for jail and courthouse purposes, either or both.

It is my contention that this purchase of land under the authority conferred by statute was itself a dedication of the entire amount purchased to the uses of the public. Counsel travels out of the record to inform the court that a brick wall has been built, separating the east half of the lot, upon which the jail building stands, from the other part; but, even if the court were properly advised of this fact, it would not alter the legal status of the matter. It would not affect the fact that this land was bought with the public money for jail and courthouse purposes. Necessarily so, for the county lacked authority to purchase for any other purpose. It will not do to say that, since the jail was built on one part of the lot, the other part was never devoted to public use. The dedication to a public use did not consist in the act of building a jail on the property, or inclosing it with a wall. It consisted in the very act of making the purchase and expending

therefor some part of the public money. The character of the land as property held in trust for the public cannot be changed by the mere fact that some part thereof was not put into actual and immediate use. Perhaps it had never been needed; but who can say that the time would never come when it would be needed? Mere nonuse of the property does not indicate conclusively that the purpose of the dedication has failed or been abandoned. *Rowzee* v. *Pierce,* 75 Miss., 846, 23 South., 307, 40 L. R. A., 402, 65 Am. St. Rep., 625.

Learned counsel relied upon the case of *Yolo County* v. *Burney,* 79 Cal., 375, 21 Pac., 833, 12 Am. St. Rep., 152; but I respectfully submit that this case is authority for the county's contention in this matter. In that case there had been a purchase by the county of certain lands for a hospital. A building was erected on a part of the land so purchased, and adverse possession for fifteen years on the part of defendant as to certain parts of the land upon which the buildings were not erected. The California court disallowed the claim of adverse possession and held that the entire tract had been dedicated to a public use and was held by the county in trust. The statement of facts in the opinion shows, it is true, that for eight years after the hospital was established all the land had been used for the necessities of the hospital; but manifestly for fifteen years there had been no such use. The principle underlying the decision seems to be that property, when once dedicated or set apart for a public use, does not lose its character as trust property by mere nonuse. It would follow that, if it could be shown that the land here in controversy was ever devoted to public uses, it would so remain beyond the power of the county to sell, except as provided by statute, or of private persons to acquire by prescription.

I again call attention to the case of *Norrell* v. *Augusta Ry. & Electric Co.,* 116 Ga., 313, 42 S. E., 466, 59 L. R. A., 101, cited in my original brief, for the purpose of making this observation. That case discloses that the strip of land in controversy, though dedicated for use as a street, had never been in fact so used, and

had remained for many years without any assertion of authority over it by the county authorities.

The case of *City of Alton* v. *Illinois T. Co.*, 12 Ill., 38, 52 Am. Dec., 479, has some application. It is there said: "Nor do we think the rights of the public are barred by our statute of limitations, which prescribes that certain real actions shall be brought within seven years after possession taken by the defendants. Without stopping to inquire whether the rule that laches are not imputable to the public, or that time does not run against the government, applies to inferior municipal corporations, such as towns, cities, and counties, as well as to the state, we entertain no doubt that this statute has no application to the case before us. Whatever title to these public grounds may be vested in the city, she has not the unqualified control and disposition of them. They were dedicated to the public for particular purposes, and only for such purposes can they be rightfully used. For those purposes the city may improve and control them, and adopt all needful rules and regulations for their management and use; but she cannot alien or otherwise dispose of them, for her own exclusive benefit, nor are they subject to the payment of her debts. At most, she but holds them in trust for the benefit of the public. The right to the use of the property is not limited exclusively to the citizens of Alton; but the citizens of the state generally have an equal right with them in the appropriate enjoyment of the dedication. This is not like the case of property purchased by the city for her own exclusive use, which she could dispose of at her pleasure. Whether adverse possession would run against property thus held we do not now propose to inquire; but we entertain no doubt that this statute does not apply to this case, and that the rights of the public in this dedication have not been forfeited by nonuser or barred by adverse possession." It thus appears that one of the tests applied by the court was that the property was not held for sale by the municipality and was, indeed, beyond the power of the city to sell.

The holding in *Shreveport* v. *Walpole*, 22 La. Ann., 526, was

based upon the theory that "a party occupying lands that have been dedicated to the public use cannot acquire title thereto, because such lands are from the moment of the dedication out of commerce, and not subject to individual or private ownership." I call the attention of the court to the fact that from the moment of the dedication the land became impressed with the public trust, and this character could not be lost. In the Pennsylvania court it was held that: "Where lands had been given in trust for a location for the county buildings, and afterwards the legislature authorized the erection of an academy on the premises, it was held that title could not be claimed by the academy, under the statute of limitations; for public rights cannot be destroyed by long-continued encroachments or permissive trespasses." *Kittaning Academy* v. *Brown,* 41 Pa., 269.

*Catchings & Catchings,* for appellee.

This is an action of ejectment, brought by the supervisors of Warren county against Mrs. Lamkin, to recover possession of a tract of land described in the declaration. To the declaration Mrs. Lamkin pleaded not guilty. Her defense is the statute of limitations. The case was submitted to Hon. T. G. Birchett, presiding judge of the circuit court, upon an agreed statement of facts, which will be found in the record, and which by agreement is to have the same effect as a bill of exceptions.

In 1840 the board of police of Warren county purchased at judicial sale lot 249 in square 44 of the City of Vicksburg. On one part of this a jail was erected. Having no need for the remainder of the lot, in May, 1872, it leased a part of it for ninety-nine years to one George McCarthy. The lease was made in pursuance of a resolution formally adopted by the board. The consideration of the lease was, to use the language of the resolution authorizing it and of the lease itself, as follows: "$862.50, the legal interest to be paid annually to said board of supervisors or their successors in office, with the privilege of said McCarthy extinguishing the debt at any time by paying the principal and

amount of interest due." The resolution authorized the execution of a lease, with covenant of title and possession to the said McCarthy. The following provision was inserted in the lease in pursuance thereof, to wit: "And the said board of supervisors covenant and agree to and with the said George McCarthy to warrant and defend the title and possession of said property to the said McCarthy, during said term of ninety-nine years, against the claims of all persons claiming the same, either at law or in equity."

On January 23, 1873, McCarthy executed to C. H. Smith a lease for ninety-nine years from May 8, 1872, of the part of the lot which had been leased to him, in controversy in this suit. A copy of his lease to Smith is in the record. On November 17, 1877, the unexpired term of Smith's lease was sold at public sale by decree of the chancery court of Warren county to the Vicksburg Benevolent Society, of Vicksburg. The consideration was $750, and the purchaser executed and delivered its promissory note for $500, paying $250 cash. A copy of the deed from the commissioner of the chancery court is in the record. On August 6, 1907, for the consideration of $900 cash, the Vicksburg Benevolent Society conveyed all of its right, title, and interest in and to the property which had been leased to Smith, and which it had purchased at the chancery sale, to Mrs. Lamkin. Its deed to her is in the record.

The agreed state of facts contains the following: "From May 8, 1872, Geo. McCarthy and those deriving title through him, including Mrs. Lamkin, have been in open, notorious possession of the said property, claiming the right to hold such possession during the whole term of the lease executed on that day to McCarthy. This has never been school land. There is no entry whatever on the records of the board of supervisors showing that the $862.50, the consideration of the lease of May 8, 1872, to Geo. McCarthy, or the annual interest thereon has been paid, or that it has not been paid. No witness can be found who can testify as to whether said $862.50 has or has not been paid."

Judge Birchett decided the case in favor of Mrs. Lamkin. A motion for a new trial was made and overruled. From the judgment, which was entered in favor of Mrs. Lamkin, this appeal is prosecuted.

The lease executed in May, 1872, by the board of supervisors to Geo. McCarthy, was no doubt void for want of power in the board to dispose of the public property of the county. It is upon the theory that the lease passed no right or title to Geo. McCarthy that this action of ejectment was instituted. We think it is settled by the decisions of this court that, even if this be true, the defendant is protected by adverse possession for the period of time designated in our statute of limitations. The statute of limitations at the date of the lease ran against the state and all of its subdivisions. While the act of 1877 (Laws 1877, p. 82, c. 49) repealed Code 1871, § 2169, so far as rights of action by the state were concerned, it left the statute intact so far as concerned rights of action by counties, municipalities, and other governmental subdivisions. This court held, in the cases of *Money* v. *Miller,* 13 Smed. & M., 531, and *Clements* v. *Anderson,* 46 Miss., 597, that at the common law the statute of limitations ran against counties, although it did not run against the state. The Code of 1880 is silent as to the operation of the statute of limitations against counties, thus leaving the question to be settled by the common law. In other words, under the Code if 1880 the rule of the common law prevailed, both as to states and governmental subdivisions such as counties. Under that rule the statute did not run against the state, but did run against counties. The statute of limitations, therefore, began to run from the date of the lease in May, 1872, and continued to run until the Constitution of 1890, which provided that it should not run against the state or any governmental subdivisions. *Chamberlain* v. *Lawrence Co.,* 71 Miss., 949, 15 South., 40; *Adams* v. *Illinois Central R. Co.,* 71 Miss., 752, 15 South., 640; *County* v. *Helton,* 79 Miss., 123, 29 South., 820. Mrs. Lamkin, therefore, and those through whom she claims title,

have been in possession of this land since 1872, claiming the right to hold such possession for the period of ninety-nine years, beginning in May, 1872. The statute, therefore, had run in her favor and those through whom she claims for more than ten years prior to the institution of this suit.

The fact that the lease to McCarthy was void does not affect the question. In the case of *Brown* v. *Supervisors,* 54 Miss., 230, a void lease had been executed by the board of police of Washington county. The lessee having failed to make payment, suit was instituted in the chancery court of Washington county to foreclose the statutory lien on the land. It was sold under a decree of foreclosure, at which Gregory became the purchaser, receiving a deed from the chancery commissioner on February 17, 1846. Under that deed Gregory and his vendees, including the defendants in the case, held possession up to the beginning of the action by the board for the recovery of the lands. The board proceeded upon the ground that the lease was void. Upon this point this court said: "That the proceedings in which the deed originated were defective, or that the deed itself conferred no valid title, will not prevent its affording such color of title that possession taken thereunder will bar the right of entry, where the same is continuous, adverse, and for the length of time prescribed by the statute." In other words, this court held that, conceding that the lease was void, yet it furnished color of title, and that possession under it for the statutory period barred the right of entry. It was alleged for the county that the title of Gregory and his vendees was derived through a lease for ninety-nine years, and that they were both tenants and assignees of the tenancy under the county, and that the possession of a tenant is never adverse to his landlord. Upon this point the court said: "This is confounding two wholly different things, to wit, the setting up of an adverse title outside of the lease and an adverse holding under it. A tenant may not set up any claim adverse to the title of his landlord, or, in other words, may not question his landlord's title; but where the attempt is to oust him, upon

the allegation that he never had a lease, and the question is whether in point of fact such a lease ever existed, he may rely upon his possession, not as adverse to his landlord's title in fee, but as really in subordination to it, though adverse to the landlord's claim of immediate possession. He acknowledges his landlord's right to the reversion, but claims that he holds a term for years; and as to his claim he may rely upon a possession sufficiently prolonged to toll the right of entry. In the case at bar the defendants, having gone in under a lease for ninety-nine years, can never claim that their possession during that period was adverse to the plaintiff's right to the reversion; but they may set up the same in an action to eject them during the continuance of the term."

The case of *Jones* v. *Madison County,* is also instructive in this connection. In that case the board of supervisors of Madison county, on April 14, 1851, leased certain school lands for ninety-nine years to Thos. Shackleford, who executed his promissory notes for the purchase money. On January 23, 1861, Shackleford conveyed his unexpired term to a man named Hill, who entered into possession. It will be noted that Shackleford did not lease the land to Hill, as McCarthy did to Chas. H. Smith in the case at bar, but assigned his unexpired term. Hill executed his notes for the purchase money, payable to Shackleford, but died before paying them, being insolvent. In 1868 Shackleford obtained a decree to enforce his vendor's lien on the land for the payment of Hill's notes, but no steps were taken to execute the decree. In 1869 suit was brought against Shackleford upon two of the notes he had given to the county when the lease was made to him in 1851. The county agreed to dismiss this suit if Shackleford would reconvey to the county the unexpired term of his lease. In March, 1877, Shackleford did reconvey. In May, 1879, the board of supervisors leased the same lands to Jones for fifty years. Jones paid the price and went into possession, and from that time on had been in the peaceable and adverse possession thereof. On September 13, 1893, the

county filed a bill under Code 1892, § 4147, which is the same as Code 1906, § 4698, to cancel Jones' claim under his lease as a cloud upon its title. Jones did not plead that his title to his term of fifty years was protected by the ten year statute of limitations. He rested his defense upon the contention that Hill, who had acquired Shackleford's unexpired term, had been in possession for more than ten years, and so he asserted that the county had no title which could be used to deprive him of possession. The court, referring to and approving the case of *Brown* v. *Supervisors*, 54 Miss., 230, said that if the law now (meaning when this suit was brought) was that the statute of limitations ran against the county and state as it did when that case was decided, that case would be conclusive of this: It remarked that, because statutes of limitations did not then run against the state and counties, it was supposed by counsel that that fact took the case before it from the control of the decision in *Brown* v. *Supervisors*. The court said that that was a mistake, and that counsel mistook the illustration for the rule. It then said: "The principal is that, when the lessee has paid for the term, he owes no duty to his landlord, except not to dispute his title to the reversion. The term then becomes the property of the tenant, and in defense of that he may fight the landlord 'tooth and nail' as he may a stranger. He may use any weapon he may find in his arsenal in defense of his term. If the statute of limitations is available, he may shelter behind that. If it is not, he may resort to any defense which does not controvert the reversionary right of the landlord, nor violate the terms of his own contract. It is true the statute of limitations, as against the county's title cannot now be invoked; but, when the law was that it could be, its effect was that the defendant had acquired that title by adverse possession." In other words, the court held that, while the law was that the statute of limitations ran against counties, Jones had acquired title to the full term of his lease by adverse possession. It then called attention to the fact that Jones had not pleaded that he had derived title to his term by virtue of

the statute of limitations. It pointed out that Jones rested his defense upon the claim that the county had no title, but that it was in the heirs of Hill, and that this title he had acquired by limitation. It then significantly added that, while the county might repudiate the validity of the lease to Hill, it could not, by the lease which it rejected, bind Jones by estoppel arising from it to contest on any ground the demand made against him. In other words, the court held upon this point that the county could not repudiate the lease as being void, and at the same time treat it as a lease for the purpose of estopping the lessee from setting up adverse possession.

It seems to be clear, under the repeated decisions of this court to which reference has been made, to the effect that up to the Constitution of 1890 the statute of limitations ran against counties, that McCarthy, if he had continued in possession himself, might have pleaded the ten year statute in bar of this suit. The statute had run from 1872 until 1890, making a complete bar. In the case of *Brown* v. *Supervisors,* 54 Miss., 230, it was contended that the possession was not adverse, because it was not shown that Gregory ever paid the purchase price of the land. It was alleged that a vendee, being let into possession of land by the vendor, does not hold adversely, but in subordination to and in trust for him until payment of the purchase money. Certain cases, including that of *Benson* v. *Stewart,* 30 Miss., 49, were cited in support of this contention. As to this contention this court said: "The case of *Benson* v. *Stewart,* was a sale by title bond, and all the other cases were contracts for future purchase only. In such cases, it is properly held that the possession is not adverse, but in privity with and in trust for the vendor, and that the vendee will be permitted to plead neither the statute of limitations nor an outstanding title which he has bought in, until there has been payment of the purchase money. Whether the title would not become adverse from the time when all remedy for collection of the purchase money is barred has, perhaps, not been definitely settled in this state." The doctrine con-

tended for and the cases cited clearly have no application whatever to the controversy before this court.

The suggestion of the attorney general that the agreed statement of facts does not show adverse possession is hardly made seriously, we think. It shows that Geo. McCarthy and those deriving title through him, including Mrs. Lamkin, have been in notorious possession of said property, claiming the right to hold such possession during the whole term of the lease executed to McCarthy. The claim of the right to hold possession during the whole term of the lease can be nothing more or less than a claim to hold it against the county, and this claim was accompanied by open, notorious possession. The use of the word "adverse," in describing the possession, would have been useless, inasmuch as the possession shown was necessarily adverse.

The attorney general assumes that the land in controversy was purchased by virtue of the act of June 28, 1822. While there is no proof upon this point, we have no objection to the assumption being made. We limit this statement, however, in this particular. It may be assumed that the board of supervisors bought the whole of lot 249 for the purpose of making use of a part of it for a jail. There is no warrant for assuming that they bought the lot, intending to make use of the whole of it for jail purposes. It will be seen from this that lot 249 fronts two hundred ninety-five feet on Grove street and one hundred forty-seven and one half feet on Cherry street. It will be seen that the courthouse square fronts on Cherry street and Grove street. It will be seen that the county appropriated one hundred forty-seven and one half feet, or just one half, of the lot 249 for jail purposes. It will be seen that the jail building was located on the western part of the portion of lot 249 appropriated to jail purposes, so that a considerable jail yard was left. We make the statement for the purpose of showing that the court cannot assume that the whole of lot 249 was bought for and dedicated to the public use for jail purposes. Around that portion of lot 249 which was dedicated to jail purposes the county erected a

thick brick wall twenty feet high, separating the part of the lot ·dedicated to jail purposes entirely from the remaining part of lot 249. The county, no doubt, desired to have its jail and jail yard in close proximity to the courthouse; and it is more than likely that they purchased this lot so that they might erect their jail, as in fact they did, diagonally across the street from the ·courthouse.

It appears from the agreed statement of facts that this purchase was made at judicial sale. This justifies the presumption, which is supported by what happened afterwards, that the county bought the whole of lot 249, because it had to do so in order to get the part of it which they desired to use for jail purposes. The purchase was at a judicial sale, at which the county had to buy the whole of lot 249 or none of it. We also state as a matter of fact, for the purpose of showing that there is no warrant for the presumption that the whole of lot 249 was dedicated to jail uses and bought for that purpose, that only that portion of lot 249 inclosed within the jail walls was ever used by the county for any purpose whatsoever. We state for the purpose of showing that no such presumption can be indulged, that at the same time the lease was made to McCarthy of fifty-seven feet six inches, counting from the eastern wall of the premises, a lease was made to the Methodist Church of the remaining ninety feet of lot 249. The part leased by the Methodist Church is now in the possession of Mr. G. W. Rodgers, who holds by assignment of the lease. We have stated these facts, though they are not in the record, for the purpose of showing that, if the court ·should make the presumption suggested by the attorney general, it would make a presumption not justified by the actual facts. The burden of proof is upon the county, and, if the county's case would be helped out by showing that the land in controversy was purchased by the county for and dedicated to jail uses, the county should have proven it. The court will not assume it in ·order to help out the county's case.

The county should have done what was done in the case of

*County of Yolo* v. *Barney,* 79 Cal., 375, 21 Pac., 833, 12 Am. St. Rep., 152. In that case title by adverse possession was pleaded to property which the county claimed had been dedicated by it to hospital purposes for the benefit of the public. In discussing the case the court said: "The facts in evidence show that the land was purchased by the county, acting through its quasi trustees, the board of supervisors, for the purpose of erecting thereon a county hospital, and using the land for purposes connected therewith. The hospital had been established thereon for about eight years, when the defendant's grantor took possession of and fenced the portion of land in controversy, which up to that time had been uninclosed, and the defendant's possession by herself or grantors has been since that time, for about fifteen years, peaceable and continuous. A deed to the land was made to the plaintiff in 1863 by one Freeman, and duly recorded, and a quitclaim deed was also made from the same grantor to the defendant's grantor, one Sill, in 1867. The whole controversy seems determinable by ascertaining whether or not the land was dedicated to a public use when the hospital was erected thereon. If it was dedicated to a public use, then, under the decision of the appellate court in *Hoadley* v. *San Francisco,* 50 Cal., 276, it could not be subjected to the operations of the statute of limitations. If it was not so dedicated, it would be subject as lands ordinarily held by a municipality are, to the running of the statute. *San Francisco* v. *Calderwood,* 31 Cal., 588, 91 Am. Dec., 542 ; *Hoadley* v. *San Francisco, supra.* Was it devoted or dedicated to a public use ? It was purchased for the purpose of building a county hospital on a portion of it, and using the balance of it for the necessities of the hospital. For eight years all the land was necessary for, and was used for, the purpose of maintaining the hospital before the defendant's entry and possession. The hospital was not removed from the land until within about a year of the institution of this action." It will there be seen that the county of Yolo realized that in order to overcome the title set up by adverse possession it was incumbent

upon it to prove that the land in controversy was purchased for and actually dedicated to public uses.

This leads us to discuss somewhat the doctrine that the statute of limitations, even where it is declared to run against counties and municipalities, cannot be made the means of acquiring title by adverse possession to property which has been dedicated to public uses. The writer of this brief was the special judge who presided on the trial in the circuit court of Warren county of the case of *Vicksburg* v. *Marshall,* 59 Miss., 563. He made the first ruling, so far as he is advised, made in any of the courts of this state, that title to a public street could not be acquired by adverse possession. The true ground upon which rests the doctrine that title by adverse possession cannot be acquired to streets and highways and other property devoted to public uses is that any obstruction of property of that character is a nuisance, and that so long as the obstruction lasts it is a continuing nuisance. In 21 Am. & Eng. Ency. of Law, 583, a public nuisance is thus defined: "A common or public nuisance is one that affects the people at large and is a violation of a public right, either by a direct encroachment upon public property, or by doing some act which tends to the common injury, or by omitting to do, in the discharge of a legal duty, that which the common good requires." In 2 Dillon on Municipal Corporations, c. 18, § 520, it is said: "The principle that streets and public places belong to the general rather than to the local public is one of great importance, and has been sometimes overlooked by the courts because they are public, whether the technical fee be in the adjoining owner, in the original proprietor, or in the municipality in trust for the public use. Any unauthorized obstruction of the public enjoyment is an indictable nuisance, and the proper officer of the commonwealth may proceed in the name of the public, by bill in equity, for an injunction or relief, or by other appropriate action or proceedings, to vindicate the rights of the public against encroachment or denial by individuals. So when, by its charter or constituent act,

a municipality has the usual control and supervision of the streets and public places, it may, in its corporate name, institute judicial proceedings to prevent or remove obstructions thereon."

In the case of *Yates* v. *Town of Warrenton,* 84 Va., 337, 4 S. E., 818, 10 Am. St. Rep., 860, the court quoted this paragraph from Dillon on Municipal Corporations and applied the principle. They said: "In the case of *Taylor* v. *Commonwealth,* 29 Grat., 780, this court held that a 'valid dedication of a street to the public use, perfected by acceptance, makes it a highway, an unlawful obstruction of which is not legalized by lapse of time. *"Nullum tempus occurrit regi"* applies in this state to the commonwealth as it does in England to the King.' And again: 'Nor can there be any doubt or difficulty in the case as to the question of law in regard to the effect of the lapse of time and adverse possession upon the public right.'" The court concluded by finding that the property claimed by adverse possession was part of a public street, and upon this said: "The dedication being established, his encroachment was a nuisance, which is not helped or aided by lapse of time."

In the case of *Raht* v. *Southern Railway Co.,* 50 S. W., 77, the Court of Chancery Appeals of Tennessee said: "In the case of *Sims* v. *Chattanooga,* 2 Lea., 694, it was expressly held that the statute of limitations would not run against a public right, and that any kind of obstruction upon a street or highway was a continuing nuisance, and that no length of time could confer any rights on the wrongdoer, or divest the rights of the public. See, also, Elliott, Roads & S., p. 490; *Childs* v. *Nelson,* 69 Wis., 125, 33 N. W., 587; *City of St. Louis* v. *Missouri Pac. Ry. Co.,* 114 Mo., 13, 21 S. W., 202; *Heddleston* v. *Hendricks,* 52 Ohio St., 460, 40 N. E., 408. In the case of *Depriest* v. *Jones* (Va.), 21 S. E., 478, it was held that this principle applied, and it made no difference whether the action to open the street should be brought by the municipal authorities, or by an individual whose property abuts on the highway. It was said: 'There can be no rightful, permanent, private possession of a

public street. Its obstruction is a nuisance punishable by indictment. Each day's continuance thereof is an indictable offense, and it follows, therefore, that no right to maintain it can be acquired by prescription.' It is further said in that case: 'It would be a grave reproach to the law to permit a wrongdoer, one who is daily violating the law of the state itself, to take advantage of his own wrong and that of the municipality, and by such indirect and wrongful means obtain a right to the street, which the corporation is prohibited from directly granting or destroying.' It therefore follows that, it being established that these were public streets, the defendant can acquire no rights therein by possession, however long continued; each day's possession being simply an additional offense. The streets are there, and the complainants, by reason of their rights as abutting property owners, are entitled to the free and unobstructed use thereof; and a decree will be entered accordingly."

In the case of *Wolfe* v. *Town of Sullivan*, 133 Ind., 331, 32 N. E., 1017, the supreme court of Indiana said: "The common law maxim is: 'Once a highway always a highway.' Highways belong to the public, and are under the control of the sovereign either immediately or through local governmental instrumentalities. The right of the public to the use of the highways is not barred by the statute of limitations. No one can acquire a right to the adverse use of a legally established highway by user, no matter how long such use may continue; for each day's user is a nuisance punishable by fine. There can be no such thing as a permanent rightful private possession of a public street."

In the case of *Ralston* v. *Weston,* 46 W. Va., 544, 33 S. E., 326, 76 Am. St. Rep., 842, the case mainly relied upon by the attorney general, the supreme court of West Virginia said: "The only logical conclusion that can possibly be reached is that the public easement in all the highways of the state, whereever situated, is sacred from individual encroachment, and that interference therewith by private interests is a continuing nuisance, subject to abatement whenever the growing necessities of the peo-

ple require such easement for the uses to which the land to which it attaches was originally dedicated." And on page 843 of 76 Am. St. Rep., (46 W. Va., 544, 33 S. E., 326), in alluding to previous decisions of that court which held otherwise, it said: "The doctrine of *stare decisis* cannot be invoked to perpetuate public nuisances or destroy the sovereignty or welfare of the people." And again on page 840 of 76 Am. St. Rep., (46 W. Va., 544, 33 S. E., 326), the court said: "If the easement is interfered with by an individual while it is alive, such interference is a public nuisance, and it matters not how long it is continued. It can never destroy the easement, for it is under the ban of the law and subject to abatement at any time. A nuisance can never oust a public easement, no more than an individual can take away the sovereignty of the people. He may forfeit his property and rights to them; but they can never, in a popular government, forfeit their sovereignty to him. He may cease to be a part thereof, but cannot enjoy more than his equal share therein. His nuisance must yield to their sovereignty whenever they see fit through their proper agencies, to exercise it. Once a nuisance always a nuisance. Once a highway always a highway, until legally discontinued, changed or altered."

Much is said in the authorities to the effect that streets and highways and other public places are held by the state or county or municipality, as the case may be, in a governmental capacity. This is true as to all places which have been dedicated to the use of the public. This is for the reason that by such dedication the public acquire an easement which is superior to the mere title which the state or county or municipality may hold. It is the duty of the state or county or municipality to govern and control and regulate the user of such public places in such manner as will conduce to the public welfare. This is what is meant by their holding such public places in a governmental capacity. The title is really suspended so long as property remains dedicated to a public use, and the real beneficial ownership is in the people, through the easement which they have. It was well said by the

supreme court of West Virginia, in the case of *Ralston* v. *Weston,* 46 W. Va., 544, 33 S. E., 326, 76 Am. St. Rep., 642, that to allow a plea of the statute of limitations in such a case would not be to bar any right that a municipality had in a street, but to destroy the public easement. It said that to sustain such a plea would not oust the municipality, for its governmental control would still remain, but it would oust the people, taking from them their right to use the street as a public highway. This use of their highways and of other public places is a sovereign right common to all the people, and of which they cannot be divested by the negligence or failure to perform its duty by a municipality. It is well said in the case of *Webb* v. *Demopolis,* 95 Ala., 116, 13 South., 289, 21 L. R. A., 62, that "a city or town has no alienable interest in the public streets thereon, but holds them in trust for its citizens and the public generally; and neither its acquiescence in an obstruction or private use of a street by a citizen, or laches in resorting to legal remedies to remove it, nor the statute of limitations, nor the doctrine of equitable estoppel, nor prescription can defeat the right of a city to maintain a suit in equity to remove the obstruction." In the case of *St. Vincent Orphan Asylum* v. *City of Troy,* 76 N. Y., 108, 32 Am. Rep., 286, it is said: "The defendant's duties as commissioner of highways differ with regard to the control of the streets from its rights as a mere proprietor of property. Those duties are, to some extent, governmental for the benefit of the public, and the public cannot be barred by their neglect." In the case of *State* v. *Berdetta,* 73 Ind., 198, 38 Am. Rep., 117, it is said: "But, more than this, he who does seize a part of the public highway for private purposes knows, not only as a matter of law, and that is conclusive knowledge, but as a matter of fact, that he is invading the rights of all the citizens of the state, for all have a right to the free use of the highway." And again the court said: "Public highways belong, from side to side and end to end, to the public."

That the title to property which has been devoted to a public

use becomes vested in the public by reason of its easement therein is stated in the case of *Board of Education* v. *Martin,* 92 Cal., 209, 28 Pac., 801. It was expressly held that the proprietary interest in all property dedicated to public uses is in the public. The court said: "The jails, courthouses, hospitals, schoolhouses, and engine lots of such corporations are as much public property, and to be governed by the same rules and limitations, as are the streets and highways and public squares which such corporations may have caused to be opened or set apart for public use. Their public character is not taken away because they are subject to local regulations in their management and use. The propietary interest in all such property belongs to the public, and, whether the legal title to such property be in the municipality or any of its officers or departments, it is at all times held by it or them for the benefit of the whole public, and without any real proprietary interest therein." The doctrine is also enunciated in the case of *New Orleans* v. *United States,* 10 Pet. (U. S.), 720, 9 L. Ed., 573, as follows: "It is admitted that the power of the sovereign over the streets of a city is limited. He cannot alien them, nor deprive the inhabitants of their use, because such use is essential to the enjoyment of urban property; and a distinction is drawn, in this respect, between the streets of a city and other grounds dedicated to public use. The latter, it is contended, is not only under the supervision of the king, as to its use, but he may sell and convey it. Now, it would seem, in reason, that the principle is the same in both cases. The inhabitants of a town cannot be deprived of their streets, as the streets are essential to the enjoyment of their property. In other words, by closing the streets, the value of the buildings of the town would be greatly reduced, if not entirely destroyed. And if ground dedicated to public use, which adds to the beauty, the health, the convenience, and the value of town property, be arbitrarily appropriated by the sovereeign to other purposes, is not the value of the property, which has been bought and sold in reference to it, greatly impaired? The value may

not be reduced to the same ruinous extent as it would be to close
the streets; but the difference is only in the degree of the in-
jury, and not in the principle involved.   Domat, liv. 1, tit. 8,
§ 1, art. 1, says there are two kinds of things destined to the
common use of men, and of which every one has the enjoyment.
The first are those which are so by nature, as rivers, the sea, and
its shores.   The second, which derive their character from the
destination given them by man, such as streets, highways,
churches, market houses, courthouses, and other public places;
and it belongs to those in whom the power of making laws and
regulations in such matters is vested to select and mark out the
places which are to serve the public for these different uses."

It will be seen that the supreme court of the United States
held that because streets, highways, churches, market houses,
courthouses, and other public places are destined to the common
use of men, of which every one has the enjoyment, the sovereign
cannot alien them, nor deprive the people of their use.   This is
for the reason that the alienable interest does not exist; the peo-
ple, through their easement, being the real owners.   This court,
in the case of *Laurel v. Rowell*, 84 Miss., 441, 36 South., 543,
said:   "All the citizens of a town have the right to have their
public thoroughfares, streets, or alley, whether acquired by dedi-
cation or user, kept open for their own use and the use of visit-
ing strangers, who come for commerce or social intercourse."
And it held that the easement in a street is property in the pur-
view of our constitution.   The meaning of all these cases, and
many others of a similar nature which might be cited, is that in
all property which is dedicated to a public use the people have
an easement which makes them the real owners.   The county or
municipality, as the case may be, exercises governmental author-
ity over such places for the protection of this easement owned
by the public and for the benefit of the public.   So long as the
property remains dedicated to public uses, the municipality or
the county has no alienable interest; the real ownership being
in the people by virtue of their easement.   The doctrine does

not rest upon the suggestion made by the attorney general that all property which a county or municipality has no legal right to sell is held in a governmental capacity.    A municipality or a county may own property which is not dedicated to public uses, and yet which for the want of statutory authority, it has no power to sell.    The test is, not whether the county or municipality has been vested by the state with power to sell, but whether it has any alienable interest in the property which it could sell.

Whenever property has been dedicated to the public use, it may be said that the municipality or the county holds it in a governmental capacity; and so it may be said that, as to all property held by a county or municipality in a governmental capacity, any obstruction of it is a nuisance, and every day's obstruction is an additional nuisance, so that it can never be acquired by adverse possession.    It must be borne in mind that no property is held in a governmental capacity, except that which has been dedicated to public uses.    The agreed state of facts does not show that the property in controversy was ever dedicated to public uses.    It does not show, therefore, that the public ever acquired any easement which gave it the real ownership in this property.    It shows, therefore, that the county did have an alienable interest in the property, although the legislature had never given it the power to convey this alienable interest.    In other words, it was property which could be alienated, and against the alienation of which the public had no right to complain.    We repeat that the facts would show that this property never was used at all for public purposes, and if the presumption which the attorney general invites the court to indulge in should prevail it would be contrary to the very truth of the case.    But, the burden of proof being upon the county of Warren, it was incumbent upon it, in order to avoid the statute of limitations, to show clearly that the property which was sought to be recovered had been dedicated to public uses, so that any person occupying it would be guilty of a public nuisance.

We insist that the cases of *Brown* v. *Board of Supervisors,*

54 Miss., 230, and *Jones* v. *Madison County,* 72 Miss., 777, 18 South., 87, hereinbefore commented upon are directly in point. The school sections, which were held to have been acquired by adverse possession in those cases, were not dedicated to public uses. As said by the supreme court of the United States, in the case of *Cooper* v. *Roberts,* 18 How. (U. S.), 181, 15 L. Ed., 338: "The trusts created by these compacts [meaning the compacts with regard to school sections] relate to a subject certainly of universal interest, but of municipal concern, over which the power of the state is plenary and exclusive." In other words, the court held that the states acquired an alienable interest in all school sections which would not have been the case if they had been devoted to public uses. While the townships were entitled to be helped by the school sections, it was for the state to say in what manner that help should be rendered. The states had the right to sell them and use the proceeds in aid of the schools, or they had the right to lease them and use the rents in support of the schools. But the lands themselves were not devoted to public uses; that is to say, the inhabitants of the township had no easements in the lands which entitled them to a physical use of the lands, and which would prohibit the state from selling or disposing of them. Hence, this court, in the cases cited, held that the statute of limitations could be availed of to make good a title by adverse possession to school sections. It is true in these cases only a title by adverse possession was asserted to a term fixed by lease; but that was not the point of the decisions. Title to school sections could as well be lost by simple adverse possession as title to the unexpired term of the lease. This was so expressly held in the following cases: *Miller* v. *State, Use, etc.,* 38 Ala., 600; *Burks* v. *Mitchell,* 78 Ala., 61; *Hargis* v. *Inhabitants, etc.,* 29 Ind., 70. So we say that the property here was not devoted to public uses, and that, in fact, it never was applied to any public or private use. We say that the people acquired no interest in this property and no right to use it. The county, therefore, had an alienable interest, which it could have

conveyed lawfully if it had had statutory authority. If this be so, then the defendant is entitled to hold for the unexpired term of the ninety-nine year lease which was made to Julius Mc-Carthy.

It must not be forgotten in the consideration of this case that the appellee is not a mere intruder or trespasser or squatter. It must be remembered that she and all others, beginning with McCarthy, have been in possession, not only with the consent and permission of Warren county, but under a certain contract by which the property was leased to them; the lease containing the county's covenant of title. This fact alone is enough to show if we are to indulge in presumptions, that this property was never dedicated to public uses. It shows that only so much of lot 249 as is included within the jail walls was dedicated to public uses. It shows that the remainder of lot 249, including the particular property in controversy here, was .not held by the county of Warren for public uses. It is not to be presumed that the county would solemnly convey away for ninety-nine years property which it .held and which was needed for public uses. Under these circumstances we insist that the county of Warren is now estopped from attempting to oust appellee and others similarly situated. In Dillon on Municipal Corporations (3d ed.) § 675, it is said, speaking of municipal corporations: "But such a corporation does not own and cannot alien public streets or places, and no laches, on its part or on that of its officers can defeat the right of the public thereto. Yet there may grow up in consequence, private rights of more persuasive force in the particular case than those of the public. · It will, perhaps, be found that cases will arise of such a character that justice requires that an equitable estoppel shall be asserted, even against the public; but, if so, such cases will form a law unto themselves,. and do not fall within the legal operation of limitation enactments. The author cannot assent to the doctrine that, as respects public rights, municipal corporations are within ordinary limitation statutes. But there is no danger in recognizing the

principle of an estoppel in *pais,* as applicable to such cases, as this leaves the court to decide the question, not by the mere lapse of time, but by all the circumstances of the case to hold the public estopped or not, as right or justice may require."

This doctrine that an estoppel might arise which would protect one in possession of property dedicated to public uses is expressly recognized by this court in the case of *Witherspoon* v. *Meridian,* 69 Miss., 295, in which it is said: "We are committed to the doctrine that a public street cannot be lost and become private property by mere occupancy for the time prescribed to bar actions for land held adversely. We adhere to that, and we are not willing to declare against the doctrine of equitable estoppel as applied to protect individuals against municipal claims under some circumstances. There may be cases where we would not hesitate to use the beneficent doctrine of estoppel *in pais* against a municipality." We submit that the case now before the court is one which calls for the application of this doctrine, if it should be found that the appellee is driven to it. She and those through whom she claims have been in possession of this property for thirty-five years, believing during all of that time that they had a valid legal right to the possession. The county has never attempted during all of that time, until the institution of this suit, to assert any right whatever to the possession of the property. During all of that time it has recognized the validity of its lease. We might add that the title to this property and the other portions of the lot similarly leased has been examined time and again by members of the Vicksburg bar, and passed with approval. Sales have been made, loans have been made, and valuable improvements have been made. On one portion of the lot, held by a similar lease to that before the court, a handsome residence has been erected, and has been in the occupancy of one of our most prominent citizens as his home.

It appears from the agreed state of facts that no evidence whatever can be produced upon the question as to whether the consideration of the lease from the county of Warren to Geo.

McCarthy had ever been paid, either in whole or in part. The records are silent upon it, and no witness can be found who knows anything about it. We will discuss the question as to presumption of payment from the long lapse of time later on. What we desire now to say is that, even if it should be conceded that no part of this consideration has ever been paid, Mrs. Lamkin cannot be affected in any measure whatever thereby. It will be noted that Chas. H. Smith was not an assignee in the legal sense of the unexpired term of Geo. McCarthy. Geo. McCarthy did not assign his unexpired term, or any part of it, to Chas. H. Smith, but leased to Smith the property in controversy for the term of ninety-nine years, beginning May 8, 1872. The consideration of this lease was $500, which Smith paid cash in hand, and a stipulation on the part of Smith that he would pay the portion of interest required by said board. The effect of the terms of the lease to Smith was to preclude the idea that he was to become the assignee of the term. While without this stipulation a mere naked lease for the full term of McCarthy would have made Smith an assignee of the term, yet Smith had the right to stipulate that he should not become the assignee of the term, although he might acquire the full unexpired term. If there had been no other consideration than the $500 cash, Smith would have become the assignee of the term, because it would have been necessarily implied that he was simply taking McCarthy's place as tenant; but by the terms of the lease Smith stipulated that all that he was to pay was the $500 cash and a portion of the interest acquired by the board. It thus appears that, by the very terms of the lease, Smith stipulated that he should not be deemed to have stepped into McCarthy's shoes and assumed all of McCarthy's obligations to the board. Smith, therefore, became, in legal effect at least, a sublessee under McCarthy, although the term acquired from McCarthy was of equal length with that acquired by McCarthy from the county. Being in legal effect a sublessee, and not an assignee of McCarthy's unexpired term, there was no privity of contract between

him and the county of Warren, and he did not become the debtor of the county of Warren, nor did he come under any obligation whatever, financially, to the county of Warren, and the county could not have sued out against him an attachment for rent. *Ashley* v. *Young,* 79 Miss., 129, 29 'South., 822.    Chas H. Smith, therefore, while deriving title through Geo. McCarthy, did not enter into possession under the lease from the county of Warren to McCarthy, but under the lease from McCarthy to himself.    Although the lease from the county to McCarthy may have been void, so that McCarthy was without title, yet his lease to Smith furnished color of title.    Smith, therefore, went into possession under color of title in the form of a lease to himself from McCarthy.    The interest of Smith in this lease from McCarthy was conveyed by decree of the chancery court of Warren county to the Vicksburg Benevolent Society, as appears distinctly from the conveyance of the commissioner of that court.    The Vicksburg Benevolent Society conveyed to Mrs. Lamkin all of its right, title and interest in and to the property described in the declaration.    Its right, title, and interest in that property consisted in its ownership of the unexpired lease from McCarthy to Smith.

From the foregoing it follows that, if McCarthy could set up a claim by adverse possession because of the lease from the county of Warren to him, Mrs. Lamkin can plead that adverse possession in this suit as against the county; but, if McCarthy could not have pleaded adverse possession, Mrs. Lamkin may, nevertheless, do so by virtue of Smith's entry and adverse possession under the lease to him from McCarthy, and the entry and adverse possession of the Vicksburg Benevolent Society, claiming under and through Smith's lease.    Even if Smith, the lessee of McCarthy, the Benevolent Society, and Mrs. Lamkin are to be regarded in the full sense as assignees of the term, they nevertheless came under no financial obligation to the county for the payment of the sum stipulated to be paid by McCarthy.    The sum stipulated to be paid by McCarthy was not rent, and it is

only for rent that the assignee of the term becomes liable. Rent is thus defined in 18 Am. & Eng. Ency. of Law, p. 260: "A rent may be defined as a right to a certain profit issuing peroidically out of lands and tenements corporeal, in retribution for the land that passes." This definition is confirmed by all of the law writers. In Taylor's Landlord & Tenant (5th ed.), p. 104, § 152, it is said: "Rent as such is not, as we have observed, essential to a lease; for from favor, or for a valuable consideration paid in gross, the tenant may have a lease without any render. But some consideration, either express or implied, must appear to give validity to the lease as a contract; and this is either a good consideration, as natural affection, or valuable, as money, or the rent reserved." The consideration of the lease from the county to McCarthy was not rent reserved, but was a valuable consideration to be paid in gross. Hence it was a personal obligation upon McCarthy, and did not become transferred to Smith, his assignee, if we treat him as such. That this is the true view is demonstrable.

It is well settled that the assignee of a term incurs no personal liability for rents in arrear at the time of the assignment. Mrs. Lamkin, therefore, under no circumstances could be made liable for rents in arrear at the time of the assignment to her. But how could any of the several assignees be made liable for any part of the consideration of the lease from the county to McCarthy? That was a sum in gross. In order to have it treated as rent, so that McCarthy's assignee and each of the subsequent assignees would become personally liable proportionately according to the length of their holding of the term, the court would be compelled to assume that the effect of the lease to McCarthy was to stipulate for $862.50 as rent, one ninety-ninth part of which was to be paid annually. In other words, it would have to be held that upon that basis of calculation McCarthy was liable for the proportion which accrued before he assigned to Smith, that Smith became liable for the proportion which accrued while he held, that the Benevolent Society became liable

for its proportionate share while it held, and that Mrs. Lamkin will be liable for her proportion so long as she holds the term. But this would be so monstrous an assumption that it cannot be indulged in. Nothing is more certain than that the county did not intend to lease this property for $862.50, one ninety-ninth part of which to be paid each year. Thus it clearly appears that the consideration for the lease to McCarthy was not rent, and that none of the assignees deriving title through McCarthy are personally liable for any part of the consideration of the lease to McCarthy.

There is still another reason why Mrs. Lamkin is under no financial obligation whatever to the county, and therefore owes no duty to it. In 18 Am. & Eng. Ency. of Law, p. 270, it is said that where no time for the payment of the rent is fixed in the lease, and the rent reserved is in gross, it is not payable until the end of the term. If the sum stipulated to be paid by McCarthy is rent, then it is rent reserved in gross, and under this rule, strictly applied, it would not be payable until the expiration of the ninety-nine years. This rule, however, is not inflexible. In the same volume, page 272, it is said that, where the lease is silent as to the time of payment, or the provisions in regard thereto are indefinite, the time may be fixed by parol. It was held by this court in *Hartsell* v. *Myers,* 57 Miss., 135, that under such circumstances parol testimony is admissible to show when the payment was to be made. By parol testimony, of course, is included the circumstances surrounding the transaction. It is clear enough, we submit, that the county of Warren never intended that the consideration of the lease to McCarthy should not become payable until the expiration of the ninety-nine year term. Assuming this to be true, then it must be held that the consideration was payable on demand. In 22 Am. & Eng. Ency. of Law, 529, it is said: "When no time is expressly fixed for the payment of money, it is payable immediately, or at least within a reasonable time." A reasonable time would certainly be within the time fixed by the statute of

limitations for barring an action to recover the sum stipulated to be paid. So that the county lost all right to institute a suit to recover the consideration of the lease to McCarthy after the lapse of six years from the date of the lease. Whether the county then became barred, or whether the debt is to be held as not due until after the expiration of the ninety-nine year lease, in either event Mrs. Lamkin owes no duty at this time to the county with regard to the payment of the consideration of the lease to McCarthy.

In view of the long lapse of time, amounting to thirty-five years, the law will conclusively presume that the consideration of the lease to McCarthy has been paid. In 22 Am. & Eng. Ency. of Law, 591, it is said: "At common law, after the lapse of twenty years from the maturity of an indebtedness, a presumption that the indebtedness has been paid arises and is controlling, in the absence of evidence to rebut it. In some jurisdictions statutes have been passed expressly recognizing this common law rule in regard to particular classes of indebtedness, or providing that the presumption shall arise after the lapse of a shorter time. The general statutes of limitations do not prevent the common law presumption of payment from lapse of time from arising." Numerous instances are thereafter cited in which this doctrine has been applied. It is said, among other things, that it has been applied to the consideration for a conveyance of land and to purchase money in contracts for the sale of land when the vendee has been in undisputed possession and the action is to recover the purchase money.

We have gone fully into the consideration of the question as to any sort of pecuniary obligation on the part of Mrs. Lamkin, for the purpose of making it clear that she is not subject to any sort of doctrine which would estop her from disputing the right of the county to the possession of the land in controversy, and as being absolutely conclusive we again refer to what this court said in the *Madison County case,* that the county cannot repudiate the lease and institute a suit based upon that theory, and at

the same time insist that it shall be regarded as a lease for the purpose of estopping the lessee.

We respectfully submit that the judgment of the court was correct, and that it should be affirmed.

Argued orally by *R. V. Fletcher,* attorney general, for appellant, and by *T. C. Catchings,* for appellee.

CALHOON, J., delivered the opinion of the court.

This case involves the question of whether a statute of limitations applies against a county arising out of the adverse possession of land. We are indebted to counsel on both sides for the very able presentation of their respective contentions, as made orally and by briefs. So lucid and strong and researchful have they been that, deciding either way, no reason or helpful authority is found by us which does not appear in their arguments. It is apparent on casual examination that, if between private persons, recovery in this case would be impossible. But the plaintiff being a county with some of the attributes of sovereignty a question presents itself here and, while there can be no criticism of the authorities in trying to recover what may be legally public property, still courts will be disposed, if they can, to apply the same rules that the law applies as between the humblest and most unpretentious private citizens. This is incumbent on us, and exceptions in favor of sovereignty in matters of property on the application of the statute of limitations must have, of course, strict construction as against the sovereignty. The doctrine, *"Nullum tempus occurrit regi,"* in its enlarged scope, is the invention and one of the instruments of despotism, and has no place in free countries, if it be attempted to go beyond the point of application strictly to holdings for the public user by the people, such as streets, parks, necessary grounds for courthouses, jails, public hospitals, etc.

The case before us is an action of ejectment by a county for a small piece of land. It is agreed that on January 14, 1840, the board of police of Warren county purchased (and, let it be

noted, purchased at a judicial sale under execution) lot No. 249, square 44, in the city of Vicksburg, which lot includes that now in controversy; that on April 3, 1840, private parties executed a quitclaim deed to the board of police for the same property, and the board took possession of all of lot No. 249, and subsequently erected a county jail on the western part of it, and the jail has remained on it to this time; that on May 8, 1872, pursuant to a resolution of the board, there was executed to Geo. McCarthy a lease for ninety-nine years of a part of it fronting fifty-seven feet six inches on Grove street, and running back the full depth of the lot; that on January 23, 1873, McCarthy leased a part of it, being thirty feet on Grove street, to C. H. Smith; that on November 17, 1877, the unexpired term of Smith's lease was sold at public sale by a commissioner of the chancery court to the Vicksburg Benevolent Society for the consideration of $500, made up of $250 cash and a note for $250; that on August 6, 1907, the Vicksburg Benevolent Society, for $900 cash, conveyed all its interest to Mrs. Mildred Hunt Lamkin, the appellee in this case; that Mrs. Lamkin is now in possession of the property, claiming the right to it for the unexpired term of the lease by the board of supervisors as aforesaid; that from May 8, 1872, Geo. McCarthy and those deriving title through him, including Mrs. Lamkin, have been in the open, notorious possession of the said property, claiming to hold it during the whole term of the lease executed on that day to McCarthy; that the property in controversy has never been school land; that there is no entry on the records of the board of supervisors showing that the $862.50, the consideration of the lease of May 8, 1872, to Geo. McCarthy, or the annual interest, has or has not been paid. The original lease to McCarthy, an exhibit in the case, was for fifty-seven feet six inches of lot No. 249, square 44, and purports to be for the consideration of $862.50, the legal interest on which was to be paid annually to the board, with the privilege to McCarthy to extinguish the debt at any time by paying the principal and amount of interest due,

and this is a warranty conveyance by the board to McCarthy; and, as we have said, there is no showing of record whether any part of the principal or interest has ever been paid. A jury was waived, and the cause tried by agreement before the court, which found for the defendant and delivered the following able opinion:

### Opinion of the Circuit Court.

"The agreed state of facts in this case sets forth that the county of Warren held the property involved in this suit as a part of the lot purchased for a jail yard, that the said parcel of land was needed for such purpose, and that on May 8, 1872, in pursuance of a resolution duly adopted, executed a lease for ninety-nine years to one Geo. McCarthy. This property has passed through a succession of mesne conveyancers until it is at the present time owned by the defendant in the instant case. It is agreed that the possession of said property has, since May 8, 1872, the time of commencement of said term, been in said lessee and his several vendees up to the institution of this suit. The county now brings ejectment to recover this lot, and defendant interposes a plea of not guilty. This cause, with jury waived, is submitted to the court for trial and adjudication. There seems, at the time the lease was made, not to have been any authority in the board of supervisors to execute this lease, and that this instrument and the resolution authorizing it were void. But it appears that the lessee and those claiming under him have been in undisturbed possession, claiming under said lease, since May 8, 1872; and now the question arises as to whether the lapse of time and the continual possession aforesaid has not operated as a curative agency, and for the term of the lease has not vested an unassailable title in the holders under same.

"To solve this question, we are to consider whether the bar of the ten-year statute (Code 1871, § 2247; Code 1880, §§ 2664, 2668) apply to this lease. We think it does, and that to the

extent of the term the said lease is beyond attack, and that the lapse of so many years, to wit, nineteen years, when such statutes applied to counties, has silently, but surely cured the void lease, and that at this day it is beyond attack. Until the constitution of 1890 the various limitations prescribed by statute ran against counties. By section 2169, Code 1871, this was expressly provided, and when by Acts 1877, p. 82, c. 49, this section was amended, the legislature only went so far as to save the rights of the state, and said act was silent as to counties, leaving this section in force as to them. The Code of 1880 is silent as to the operation of these statutes against counties, and we conclude that the common law was in force in this state on such matters. Our supreme court so decided, saying that such limitations against counties were operative at common law.· *Clements* v. *Anderson,* 46 Miss., 597. In the case of *Brown* v. *Supervisors,* 54 Miss., 230, the court held that the bar of the statute operated to prevent the county recovering school land, when held under a void lease, and, so far as the term, perfected the title of the lessees. This doctrine was reaffirmed in *Jones* v. *Madison County,* 72 Miss., 807, 18 South., 87. We therefore conclude that the board of supervisors cannot now maintain its suit for this parcel of land.

"The next question for discussion is the matter of the consideration agreed to be paid. The agreement and lease attached as Exhibit A to same does not fix any time of payment, but provides for annual interest on same. This consideration is not a rental, but a fixed purchase price, bearing interest. The records are silent as to whether this was paid, and, on account of lapse of time, no witness can now be found who has any knowledge of same. It is a matter of public history that at the time this lease was made, and in the years following the records and all matters pertaining to the county affairs were very loosely kept, as the state was then emerging from the chaotic condition following the war and reconstruction. It is to be presumed, inasmuch as the county has failed for thirty-five years to make any

effort to collect this sum, that it must have been paid. The bar of the various limitations, in force until the constitution of 1890 (Code 1871, § 2151; Code 1880, § 2669), would prevent any effort at this late day on the part of the board to collect same. By its terms the consideration was a present obligation and could have been collected on demand. The provision for the payment of interest would not prevent prescription maturing. Therefore, so far as the county is concerned, it can now have no right in court to enforce a collection of this consideration.

"The court finds for the defendant, and orders the proper judgment entered herein."

It is proper to plead the statute of limitations. If the sovereign desires to avail of the prerogative, it must show that the property does not fall within the category which would avoid this statute. In the case at bar it devolved upon the county to show that it in fact bought the property for jail purposes and that the part sold was needed for that purpose. We find here by every rule of reason and common sense that it did not need this part, which was sold for jail purposes. Although it is true that it could not have bought property except for such public purposes as jails, courthouses, etc., still it did in fact buy it, and it did in fact sell it, and it was, when it sold it, property in a condition to be potentially the subject of sale. The wholesome doctrine that, except in cases for public user, the statute of limitations did run against counties and cities, was done away with by the constitution of 1890. The convention in that case was reactionary, and went back to the old despotic doctrine, forgetting even the fact that in England sixty years would bar even the king. 3 Bl. Com., *307. Here we have it now imbedded in our written constitution that no time whatever shall bar the state or county or municipality. Wisely or unwisely, this is the fundamental law and must be observed. But it will be noted that the right to the property in this litigation, if the statute ran at all, was barred by the then existing law before the constitution of 1890 took effect. *Brown* v. *Board,* 54 Miss., 230, cited

and approved in *Madsion Co.* v. *Powell,* 71 Miss., 618, 15 South., 109; *Jones* v. *Madison Co.,* 72 Miss., 777, 18 South., 87; *Chamberlain* v. *Lawrence Co.,* 71 Miss., 949, 15 South., 40. The lease in the case of *Brown* v. *Supervisors,* 54 Miss., 230, was a void lease; but the court held that, notwithstanding it was void, the statute continued to run, because it constituted color of title.

If we assume that the whole lot was bought for jail purposes, it does not therefore absolutely follow that it all could be used for those purposes. On the contrary, it is manifest that the county had all it wanted for jail purposes, and that much of it was so occupied, and the remainder, in our judgment, was subject to be held adversely, so that title might be acquired by adverse possession for the proper time. In fact, the presumption that the whole of it was wanted for jail purposes is rebutted by the actual facts shown. It might have had to buy the whole of it in order to get the ground it actually wanted for the jail purposes, and no doubt this was the actual truth; the purchase having been made of the entire property at auction at a judicial sale. In short, any alienable interest in land in our state under the law then existing was subject to divestiture by adverse possession, whatever may have been the machinery which had to be invoked to alien it. The fact that the county sold the lease of this property for ninety-nine years and conveyed it with warranty of title ought to be of great force in compelling the conclusion that it was not dedicated to public uses, so as to avoid the statute. By this doctrine of sovereignty, in its application to the rights of owners of land, many worthy and confiding families of poor people have been stripped of house and home and compelled to begin life anew. We reiterate that this must not be done, unless it is necessitated by the strictest construction of the law in favor of the occupant.

*Affirmed.*